Sarah JAYMOT, Appellant,

v.

Elijah SKILLINGS–DONAT, Appellee.

No. S–13204.

Supreme Court of Alaska.

Sept. 25, 2009.

Andrew Josephson, Law Offices of G.R. Eschbacher, Anchorage, for Appellant.

Phyllis A. Shepherd, Law Office of Dan Allan & Associates, Anchorage, for Appellee.

Before: FABE, Chief Justice, EASTAUGH, Carpeneti, WINFREE, and CHRISTEN, Justices.

*OPINION*

WINFREE, Justice.

## I. INTRODUCTION

This appeal concerns child custody, child support, and property disputes between two parents who lived together for several years but never married, then separated and agreed to share custody of their minor child. Three years later, after moving to Oregon, the mother filed suit seeking sole custody of their child and a share of proceeds from the sale of the family house. The superior court granted the father sole legal and primary physical custody, entered a child support award in the father's favor, and denied the mother's claim to a share of the house-sale proceeds. We affirm the custody ruling as within the superior court's discretion, affirm the denial of a child support arrearage award because the claim was not raised at trial, but vacate the property ruling and remand for further proceedings to establish necessary factual findings.

## II. FACTS AND PROCEEDINGS

### A. Facts

Sarah Jaymot and Elijah Skillings–Donat met in California in 1999. They moved to Alaska together in August 1999 and settled in Anchorage, where they lived together until July 2002.

Sarah and Elijah's daughter was born in January 2002. That summer the family moved to Haines, and in the fall they moved into a house purchased for $80,000. Sarah testified that she contributed her Permanent Fund Dividend to the down-payment on the house and that the proceeds from the sale of a jointly-owned travel trailer were also spent on the house. Sarah's name was not placed on the title, nor was she an obligor on the house loan. She testified that she asked Elijah several times during their relationship to place her name on the title, but he did not. Elijah testified that he was "always extremely clear about not putting [Sarah's] name on the title of anything, and never did so." Substantial improvements were made to the house while the couple lived there together, but the parties dispute whether Sarah contributed to those improvements.

While living together, Sarah paid the couple's bills. But the parties dispute Sarah's actual financial contribution. Sarah testified:

I paid all the monthly bills. I, at least, took care of it. Received them; sent them out in the mail. Sometimes they'd all be written out of his bank account, and he would sign the checks, and sometimes they would get written out of my bank account, and we put money in. Sometimes they just got paid out of my bank account.

Elijah testified that he made out checks on his personal account to Sarah for the purpose of paying bills:

[S]he offered to pay the bills. So she always usually would pay the bills. But I didn't want to spend the time to do the math, and write all the checks, and everything, so she would do that, and I would write her a check for the amount of the bills that she was going to be writing. I did that on—I did it just for efficiency, and, then, also, when I was out of town, or wouldn't be there, I would sign blank checks. And then you will notice that much of the writing on these checks is her writing. I believe there is only one or two that were written by me, but they're all signed by me.

At trial Sarah produced checks showing mortgage and truck payments made from her account, and Elijah produced checks made out to Sarah from his account.

In June 2005 Elijah and Sarah ended their relationship and Sarah moved out of the house. They entered into an informal agreement for equal shared custody of their daughter. They both continued to reside in Haines.

In August 2007 Sarah informed Elijah that she would be moving to Portland, Oregon. On August 22, 2007, Elijah's girlfriend had an altercation with Sarah and her mother, who was visiting in Haines. Sarah's mother testified that Elijah's girlfriend arrived at Sarah's workplace and began to argue with Sarah, pushed Sarah's mother and told her to get out of the way, and then grabbed Sarah's daughter's arm and told her, "[y]our grandmother is trying to take you away from us, and we're not going to let that happen." Sarah petitioned for domestic violence protective orders against Elijah and his girlfriend, even though Elijah was not present when the altercation occurred. Sarah was granted an ex parte protective order against Elijah's girlfriend, but she was denied a protective order against Elijah. On August 30 Sarah filed a request to dissolve the protective order, explaining her reason as "consent to mediation for child custody if order is dropped."

In early September 2007 Sarah and Elijah signed an agreement to share legal and physical custody of their daughter, who was to rotate between Haines and Portland every six months. Their daughter remained in Haines with Elijah during the fall of 2007 while Sarah moved to Portland. In January 2008 their daughter moved to Portland to begin her six months with Sarah.

On January 11, 2008, Elijah sent Sarah an e-mail stating that he would take their daughter for a vacation during her spring break. Elijah and Sarah argued via e-mail over whether Elijah would be allowed to see their daughter then and, if so, for how long. In response to Elijah's January 25 e-mail stating that he would arrive in Portland the following Thursday to take their daughter for the weekend, Sarah directed all future communications to her attorney. She filed this action shortly thereafter.

### B. Proceedings

In March 2007 Sarah filed a petition with the Alaska Department of Revenue, Child Support Services Division (CSSD) for child support from Elijah. In August 2007 CSSD served Elijah with a child support order requiring him to pay $524 per month, as well as $3,144 in arrears from March 1, 2007.

In January 2008 Sarah filed suit seeking sole legal custody, primary physical custody, increased child support, and a share of property acquired during the course of the couple's relationship. Elijah moved for interim relief in the form of a temporary grant of primary physical custody requiring the daughter to return to Alaska. Sarah opposed the motion for interim relief and moved for the appointment of a custody investigator. The superior court denied Elijah's motion but modified the parties' existing custody agreement, ordering Sarah to return the daughter to Alaska on June 14,

2008. The court also denied Sarah's motion for a custody investigator.

A bench trial was held in late June 2008. On July 1, 2008, the court awarded Elijah sole legal and primary physical custody. The court found both parents were capable of providing for their daughter's needs, but also found they had difficulty communicating and compromising with one another. The court stated that "[t]o the extent the emotional capacity of the parents to properly parent is an issue, it appears from the testimony of them on the stand, that the father is more composed and capable of extracting himself from the anger of the moment" and concluded this factor "tipped slightly in [Elijah's] favor."

The court found that: (1) regarding each parent's ability to foster a relationship between the daughter and the other parent, "the evidence tends to show that [Sarah] is less capable of doing so, in part it seems due to her anger about [Elijah's] unwillingness to marry her and her belief that she should get the benefits of his property"; (2) Sarah "refuses to speak with [Elijah] and fails to promote communication ... refused reasonable requests to visit and only grudgingly allows contacts with the father"; (3) "as to [Sarah's] ability to meet the emotional and social needs of the child (which requires close connection with the father) and willingness to facilitate and encourage close contact with the other parent, [Sarah] provides a less satisfactory environment for the child"; (4) Elijah and Sarah's daughter was too young to express a preference for either parent and appeared to love both; and (4) there was "no history of domestic violence or drug abuse by either parent."

The court concluded that it was in the daughter's best interests to be primarily in Elijah's custody. The court ordered that: (1) the daughter reside with Elijah during the school year; (2) Sarah have visitation from the first Sunday after the end of school until two weeks before the start of the next school year; (3) the parents alternate winter and spring holidays with the daughter; and

(4) Elijah continue to have custody of the daughter for the remaining summer months of 2008, with Sarah to have visitation during the first week of August.

As to property acquired during the relationship, the court found that Sarah and Elijah "did not have an intent to engage in a domestic partnership and that their property and debt remains separate property."

Sarah moved for reconsideration of the trial court's custody order, arguing that the court: (1) "failed to account for the fact that [she] very well could move back to ... Haines, Alaska" and "failed to rule in the alternative that should [she] return to Haines, Alaska, [fifty-fifty] custody should be ordered"; (2) should have ordered that transportation costs be split fifty-fifty; (3) should have ordered that the daughter spend the remaining weeks of summer 2008 with Sarah; (4) "failed to consider the possibility that Sarah may be able to exercise more visitation should she come to Alaska during the school [year]"; (5) should have granted Sarah spring break and Christmas visitation every year; (6) failed to consider Thanksgiving vacation; and (7) erred by not granting shared legal custody because "there is no indication that this animosity will continue." The court denied the motion for reconsideration without comment.

The court entered a final custody order mirroring its earlier findings of fact and conclusions of law. On September 8, 2008, the court entered a final child support order requiring Sarah to pay Elijah $395 per month.

Sarah appeals both the court's custody order and its decision not to award her any property acquired while the parties cohabited. Sarah also contends that the court erred by not ordering Elijah to pay additional child support arrears.

## III. STANDARD OF REVIEW

A trial court's resolution of child custody issues is reviewed for abuse of discretion, and its underlying factual findings are reviewed for clear error.[1] "In a child

---

1. *Millette v. Millette,* 177 P.3d 258, 261 (Alaska 2008) (citing *Jenkins v. Handel,* 10 P.3d 586, 589 (Alaska 2000)).

custody case, abuse of discretion is established 'if the trial court considered improper factors, or improperly weighted certain factors in making its determination.'"[2] "A court's factual findings are clearly erroneous when our review of the entire record leaves us 'with a definite and firm conviction that a mistake has been made.'"[3] We give "particular deference to the trial court's factual findings when they are based primarily on oral testimony, because the trial court, not this court, performs the function of judging the credibility of witnesses and weighing conflicting evidence."[4]

■ A trial court's determination of the parties' intent regarding ownership of property they acquired during cohabitation is an application of law to facts that is reviewed de novo.[5]

■ "Child support awards are reviewed for abuse of discretion and 'will not be set aside unless a review of the record as a whole leaves us with a definite and firm conviction that a mistake has been made.'"[6]

## IV. DISCUSSION

Sarah raises numerous points on appeal, but her arguments can be categorized into seven separate points. She argues that the trial court: (1) failed to indicate which factors it considered important in its custody determination; (2) abused its discretion by not awarding shared legal custody of the daughter; (3) abused its discretion by determining it was in the daughter's best interests to award Elijah primary physical custody; (4) abused its discretion by not ordering an alternative custody arrangement in the event Sarah moved back to Haines; (5) abused its discretion by not awarding the visitation Sarah requested; (6) erred by ruling that Sarah and Elijah did not intend to share equally the equity in the house while they lived there together; and (7) erred by entering a child support order that did not account for arrears dating back to 2005.

### A. Custody Issues

#### 1. The trial court clearly indicated which factors it considered important in its custody determination.

■ The trial court is to determine custody in accordance with the best interests of the child by considering the list of statutory factors set forth at AS 25.24.150(c).[7] "[T]he trial court need not make express findings on all statutory factors; instead, its findings 'must either give us a clear indication of the factors which the superior court considered important in exercising its discretion or allow us to glean from the record what consider-

2. *Id.* (quoting *Gratrix v. Gratrix,* 652 P.2d 76, 80 (Alaska 1982)).

3. *Id.* (quoting *Dingeman v. Dingeman,* 865 P.2d 94, 96 (Alaska 1993)).

4. *Id.* (quoting *Ebertz v. Ebertz,* 113 P.3d 643, 646 (Alaska 2005)) (internal citations and quotation marks omitted).

5. *Bishop v. Clark,* 54 P.3d 804, 810–11 (Alaska 2002) (citing *Wood v. Collins,* 812 P.2d 951, 955–56, 955 n. 4 (Alaska 1991)).

6. *Harvey v. Cook,* 172 P.3d 794, 797 (Alaska 2007) (quoting *Moore v. Moore,* 893 P.2d 1268, 1269 (Alaska 1995)).

7. AS 25.24.150(c) provides in part:
 In determining the best interests of the child the court shall consider
 (1) the physical, emotional, mental, religious, and social needs of the child;
 (2) the capability and desire of each parent to meet these needs;
 (3) the child's preference if the child is of sufficient age and capacity to form a preference;
 (4) the love and affection existing between the child and each parent;
 (5) the length of time the child has lived in a stable, satisfactory environment and the desirability of maintaining continuity;
 (6) the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child ...
 (7) any evidence of domestic violence, child abuse, or child neglect in the proposed custodial household or a history of violence between the parents;
 (8) evidence that substance abuse by either parent or other members of the household directly affects the emotional or physical well-being of the child;
 (9) other factors that the court considers pertinent.

ations were involved.' " [8] Sarah argues that the trial court's ruling fails to do so.

In its findings of fact and conclusions of law the trial court found that: (1) the daughter does not have any unusual needs; (2) both parents are mentally and financially capable of meeting their daughter's needs, but that Elijah's emotional capacity to parent is slightly greater; (3) Sarah is less willing "to facilitate and encourage close contact with the other parent" than is Elijah; (4) the daughter is too young for her preference to be given weight but appears to love both parents; and (5) there is no history of drug abuse or domestic violence by either parent. The court made clear two factors tipped the balance in favor of granting Elijah custody: his greater willingness to allow the other parent to have contact with the daughter and his greater emotional self-control, allowing him to better meet the daughter's social and emotional needs.

Because we can easily identify the factors important to the court's custody determination, the order is not, as Sarah argues, foundationally flawed.

### 2. Declining to order joint legal custody of the daughter was not an abuse of discretion.

 Joint legal custody means that both parents "share responsibility in the making of major decisions affecting the child's welfare." [9] The legislature has expressed a preference for joint legal custody,[10] and a court may award joint custody if it is in the best interests of the child.[11] However, "joint legal custody is only appropriate when the parents can cooperate and communicate in the child's best interest." [12] The superior court found that "both parents are arrogant and selfish, and that [affects] their communication and ability to compromise with each other." The court further found that Sarah "refuses to speak with the father and fails to

promote communication." Both findings are supported by the record: Sarah stated in an affidavit that "[i]t has been clearly proven that in the decision on [the daughter's] custody arrangement the two parents cannot communicate, and therefore cannot jointly make decisions that affect the outcome of [the] daughter's life."

It was therefore within the trial court's discretion to decide that awarding sole legal custody is in the child's best interests.

### 3. It was not abuse of discretion to determine that granting Elijah sole legal and primary physical custody was in the daughter's best interests.

The trial court granted Elijah sole legal and primary physical custody of the daughter after concluding "[i]t is in the best interest of the child to be primarily in the father's custody." Sarah argues the court abused its discretion by reaching this conclusion, specifically by determining that: (1) Elijah is better able to meet the daughter's needs; (2) Elijah is more willing to allow her contact with their daughter than vice-versa; and (3) there is no evidence of domestic violence in Elijah's household.

### a. It was not error to find that Elijah is better able to meet the daughter's physical, emotional, mental, religious, and social needs.

 To determine a child's best interests, the trial court must consider "the capability and desire of each parent to meet" the child's "physical, emotional, mental, religious, and social needs." [13] The court found that both parents are mentally and financially capable of providing for their daughter and meeting her needs, but that Elijah is better able to meet the daughter's emotional and social

---

8. *Chesser v. Chesser–Witmer*, 178 P.3d 1154, 1158 (Alaska 2008) (quoting *Smith v. Weekley*, 73 P.3d 1219, 1225 (Alaska 2003)).

9. *Farrell v. Farrell*, 819 P.2d 896, 899 (Alaska 1991) (quoting 17 A.L.R. 4th 1015 n. 1) (internal quotation marks omitted).

10. *Id.* at 898 n. 1 (quoting ch. 88, § 1(a), SLA 1982).

11. AS 25.20.060(c).

12. *Farrell*, 819 P.2d at 899.

13. AS 25.24.150(c)(1)-(2).

needs because he is "more composed and capable of extracting himself from the anger of the moment" and because Sarah "refuses to speak with the father and fails to promote communication."

Sarah asserts that this finding is erroneous, arguing primarily that Elijah does not require their daughter to attend school as regularly as she should, has not historically taken care of their daughter's medical needs, has a work schedule that will interfere with raising their daughter, and has "underutilized" his custody time.

Sarah produced the daughter's fall 2007 school attendance record, when Elijah had custody under their informal agreement, showing the daughter missed eighteen days of school during a single semester while in Elijah's custody. Sarah also points to a portion of Elijah's testimony suggesting he does not make his children (their daughter and his girlfriend's daughter, who resides with Elijah and his girlfriend) go to school if they do not want to go. But Elijah made this statement while discussing his effort to supplement formal education with home instruction; he was referring to his girlfriend's daughter and explaining that a decision had not yet been made on home-schooling. Elijah testified that he was satisfied with the Haines public school and would send his and Sarah's daughter there: "But, with [her], it's clear. She wants to go to school really bad. She thrives in the social environment, so I think public school is the best thing for her." He also testified that ten of the daughter's absences from school were due to family trips taken to Whitehorse and Connecticut. The court specifically found that "[t]he parties both value education and promote it, the father's numerous trips with his daughter ... notwithstanding." This finding is not clearly erroneous.

Sarah argues that she had the "historic practice of caring for the [daughter's] medical needs" and implies that Elijah did not adequately do so. She points to Elijah's testimony that he had "never brought her to the clinic, except for her teeth" and asserts he was unaware that the daughter had contracted Hand–Foot-and–Mouth Disease. There is no evidence in the record that the daughter actually suffered from or was diagnosed with this disease,[14] and the full context of Elijah's statement that he never took his daughter to the clinic is as follows: "I've never brought her to a doctor. She's been very healthy. Sarah brought her to the clinic quite often, and felt, regularly, like she was sick and having problems. I never brought her to the clinic, except for her teeth." This evidence does not prove that Elijah is incapable or less capable than Sarah of meeting their daughter's physical or medical needs.

Sarah points to her testimony regarding Elijah's work schedule to suggest that he is less able to meet the daughter's needs because of frequent travel. Sarah testified that while she and Elijah lived together he traveled for work during the spring, summer, and fall months. Elijah, on the other hand, testified that his "field work season is in the summer." He stated that "[s]ummer is a more difficult time for me because of my career, but I work from home, and I'm in my house all day long for that entire school year." The court made no explicit finding on this issue, but the custody and visitation framework appears to fit Elijah's work schedule.

Sarah asserts that Elijah did not fully utilize his custody time with their daughter. She explains that when she decided to move to Portland and the couple agreed on a rotating custody schedule, Elijah "agreed that his six months would run from July 1 to December 31, 2007, notwithstanding that it was already September 7, 2007 when the parties' agreement was signed." Considering that the daughter would already have begun school in Haines by that time and a move would have been disruptive for her, Elijah's decision does not necessarily suggest ambivalence towards having custody, especially in light of his later attempts to visit her in Portland.

Sarah also argues that Elijah took frequent trips after their separation, during

---

14. On cross-examination Sarah's counsel asked Elijah, "Didn't [the daughter] just have Hoof–Foot–and–Mouth [sic] disease in October? Wasn't she diagnosed with that in October and had to miss some school for that? Do you recall that?" Elijah answered that he did not. No evidence of this illness was produced at trial.

which times Sarah took their daughter for additional periods of custody lasting from a few days to two weeks. Sarah's testimony on this point is insufficient to establish that Elijah did not value his time with the daughter.

In determining that Elijah is better able to meet the daughter's "physical, emotional, mental, religious, and social needs," the superior court relied heavily on evidence of Sarah's negative behavior. Sarah called the police three times in 2007 to report that Elijah had not returned their daughter to her custody on time, as per their informal agreement. The August police report states:

> Sarah JAYMOT reporting her ex, Elijah DONAT, has not returned her daughter to her. JAYMOT stated there is no custody agreement that has been written up, they have had a verbal agreement for the past 2 years that they are to exchange their daughter every Sunday. JAYMOT stated she would only like this documented as she is going to court for a custody battle.

The other two reports similarly exhibit Sarah's desire to document Elijah's breach of the informal custody agreement. She also sought a domestic violence restraining order against Elijah after the incident with his girlfriend even though Elijah was not present. In light of these incidents, the trial court's findings that Elijah "is more composed and capable of extracting himself from the anger of the moment" and that Sarah's anger and inability to get along with Elijah demonstrate her "inability to meet [the daughter's] need for healthy modeling" are not clearly erroneous.

The evidence Sarah presented to show Elijah's inability to meet their daughter's needs is unconvincing. It was not error to determine that Sarah's confrontational and negative behavior rendered Elijah the parent better able to meet their daughter's needs.

### b. It was not error to find that Elijah was the parent more willing to encourage a close relationship between the daughter and the other parent.

The trial court must consider the "willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child" in determining the child's best interests.[15] In this case the superior court determined that both parents are "intelligent enough to give lip service to promoting the other's contact with the child," but that the evidence showed Sarah "is less capable of doing so." The court noted that Sarah "refuses to speak with [Elijah] and fails to promote communication. She has refused reasonable requests to visit and only grudgingly allows contacts with [Elijah]." Sarah argues that the court's finding is erroneous.

We do not agree with the superior court's characterization of Elijah's visitation requests as "reasonable." Less than a week after transferring their daughter to Sarah's custody, Elijah sent a terse e-mail stating: "What are the dates of [the daughter's] spring break? I plan to be there with a car to spend the week with her. I need the dates to plan now." Elijah then told Sarah he had already purchased tickets and threatened to file for custody in court if she did not "honor the intent of the agreement to support [the daughter's] right to visit her father." He also stated that he would be visiting Portland the following week to take the daughter for the whole weekend. These were commands, not requests, without prior notice and paired with a threat of litigation. The finding that Sarah "refused reasonable requests to visit" is clearly erroneous.

On the other hand the court's finding that Sarah "fails to promote communication" with Elijah is not clearly erroneous; there is evidence that Sarah hindered Elijah's contact with their daughter. Elijah testified that Sarah regularly threatened to take their daughter away from him as a "bargaining chip" when he was trying to leave her. In March 2008 Sarah purchased a telephone line so Elijah could speak with their daughter at his convenience, but Elijah testified that he frequently was unable to get through to her and that "it's extremely clear when I talk to her that she is on speaker phone, and that [Sarah

---

**15.** AS 25.24.150(c)(6).

and her boyfriend] are direct[ ] participant[s] to the dialogue." It was not clearly erroneous to conclude that Sarah "fails to promote communication" between the daughter and Elijah, and that she also has tried to limit it.

Sarah argues the trial court erred in finding Elijah is the parent most willing to foster communication, pointing to evidence that Elijah sometimes failed to timely return their daughter to Sarah per their informal custody agreement, that he did not notify Sarah before taking the child on a trip to Connecticut, and failure to initiate phone contact with their daughter. Although there is conflicting evidence on Elijah and Sarah's respective capacities to put aside their differences and foster a relationship between the child and the other parent, we are not left with a definite and firm conviction the court erred in determining that Elijah is more capable in this regard.

The trial court relied heavily on this determination in making its custody ruling. "It is essential to have a custodial parent willing to foster an open relationship with the other parent when a great distance separates the [child] from the non-custodial parent, and it is reasonable for the superior court to place enhanced importance on this factor when making its decision."[16] Given the physical distance between mother and father at the time of trial, it was not an abuse of discretion to place substantial weight on this factor when determining the best interests of the child.

### c. It was not error to find a lack evidence of domestic violence in the proposed custodial household.

■ The trial court must consider "any evidence of domestic violence, child abuse, or child neglect in the proposed custodial household" in determining the child's best interests.[17] The superior court in this case found "no history of domestic violence . . . by either parent." Sarah's opening brief discusses the altercation between Elijah's girlfriend, Sarah, and Sarah's mother, then observes that the court did not discuss the incident in its factual findings. In her reply brief Sarah disputes Elijah's argument that her attempt to obtain a domestic violence restraining order against Elijah's girlfriend was unjustified (the magistrate chose to grant her a stalking protective order) by contending that "there was a domestic relationship at issue: the relationship between . . . [Elijah's girlfriend] and [the daughter]. . . . [T]hey were 'household members' as the [domestic violence] statute defines it." Sarah thus implies that there is evidence of domestic violence in Elijah's home.

Sarah is correct that the daughter and Elijah's girlfriend were household members as defined by the domestic violence statute: "adults or minors who live together or who have lived together."[18] Domestic violence is defined in relevant part as the commission of a crime listed in AS 11.41 by one household member against another.[19] Alaska Statute 11.41 includes the crimes of assault,[20] custodial interference,[21] and kidnapping.[22] Assuming Elijah's girlfriend committed assault, it was against Sarah's mother, not against Sarah and Elijah's daughter. Elijah's girlfriend's conduct as described in the protective order application and the trial testimony—grabbing Sarah and Elijah's daughter's hand and telling the child that she would not allow Sarah's mother to take the child away—is not assault, custodial interference, or kidnapping.[23] The finding that there is no history of domestic violence by either party is not clearly erroneous.

### 4. It was not abuse of discretion to decline to order an alternative custody arrangement in the event Sarah moved back to Haines.

**16.** *Silvan v. Alcina*, 105 P.3d 117, 121 (Alaska 2005).

**17.** AS 25.24.150(c)(7).

**18.** AS 18.66.990(5)(B).

**19.** AS 18.66.990(3)(A).

**20.** AS 11.41.200–.230.

**21.** AS 11.41.320–.330.

**22.** AS 11.41.300.

**23.** *See* AS 11.41.200–.230, .300, .320–.330.

 Sarah argues that the trial court abused its discretion "when it failed to order an alternative schedule when one was requested by [Sarah], in the event that [Sarah] returned to Haines, Alaska." Sarah did not make such a request in her pre-trial pleadings or at trial, nor did her trial testimony indicate that she might consider moving back to Haines. She first raised this possibility in her motion for reconsideration. She now asserts that she moved back to Haines in September 2008.

 A trial court is "under no obligation to consider an issue raised for the first time in a motion for reconsideration." [24] An issue raised in this manner is untimely and is not properly before the court on appeal.[25] Because Sarah neither made the argument nor introduced any evidence that would support it at trial, the argument is waived.[26]

### B. Property Issues

 The trial court found that "the parties did not have an intent to engage in a domestic partnership and that their property and debt remains separate property." Sarah argues this is erroneous.

 When two people reside together in an intimate relationship, the property they acquire while cohabiting should be distributed according to the parties' express or implied intent.[27] We have rejected in such cases the rule that the party who has title or possession is necessarily entitled to owner-ship of property, because that rule "tends to operate purely by accident or perhaps by reason of the cunning, anticipatory designs of just one of the parties." [28] "[A]bsent an express agreement, courts should closely examine the facts in evidence to determine what the parties implicitly agreed upon." [29] This determination is an application of law to facts that is reviewed de novo.[30]

It is undisputed that Sarah and Elijah cohabited and shared an intimate relationship for several years. Only their intent regarding property ownership is at issue in this appeal.

In *Bishop v. Clark*, we identified several factors to consider when determining the cohabiting parties' intent:

> [W]hether the parties have (1) made joint financial arrangements such as joint savings or checking accounts, or jointly titled property; (2) filed joint tax returns; (3) held themselves out as husband and wife; (4) contributed to the payment of household expenses; (5) contributed to the improvement and maintenance of the disputed property; and (6) participated in a joint business venture. Whether they have raised children together or incurred joint debts is also important.[31]

*Bishop* involved a property dispute between a couple who had dated and lived together for thirteen years; they had two children,

---

24. *Blackburn*, 103 P.3d at 906 (quoting *J.L.P. v. V.L.A.*, 30 P.3d 590, 597 n. 28 (Alaska 2001)) (internal quotation marks omitted).

25. *Id.* (citing *Stadnicky v. Southpark Terrace Homeowner's Ass'n, Inc.*, 939 P.2d 403, 405 (Alaska 1997)).

26. We note that if Sarah has returned to Haines, nothing prevents her from moving to modify the custody order. *Cooper v. State*, 638 P.2d 174, 179 (Alaska 1981) ("A motion to modify custody may be made at any time during the minority of the child involved, and the superior court has an obligation to consider such a request.").

In her list of points on appeal, Sarah contends the trial court abused its discretion by not awarding her visitation (1) every winter and spring break (instead of every other winter and spring break), (2) Thanksgiving break, and (3) in the event she travels to Alaska. Her brief points to

no evidence and makes no argument why the visitation awarded her is an abuse of discretion. The argument is therefore waived. However the specifics of the visitation framework also may be subject to modification if she has returned to Haines.

27. *Bishop* 54 P.3d at 811 (quoting *Wood*, 812 P.2d at 956).

28. *Tolan v. Kimball*, 33 P.3d 1152, 1156 (Alaska 2001) (per curiam) (quoting *Beal v. Beal*, 282 Or. 115, 577 P.2d 507, 509 (1978)) (internal quotation marks omitted).

29. *Bishop*, 54 P.3d at 811 (quoting *Wood*, 812 P.2d at 956).

30. *Id.* at 810–11, 811 n. 11.

31. *Id.* at 811 (internal citations omitted).

but never married.[32] Between 1981 and 1995 they worked two fishing permits as a joint enterprise, and the woman gave the man all of her fishing permit proceeds, keeping only a small personal allowance.[33] They filed separate income tax returns. The man purchased real property using the parties' commingled funds, but titled it in his name.[34] The trial court found an "implicit agreement of the parties to live together indefinitely and to share in the fruits of that relationship as though they were married" and awarded the woman a one-half interest in disputed property, including real property titled only in the man's name.[35] We affirmed that decision in light of the couple's use of joint checking and savings accounts for payment of household expenses, commingling of business income with the man's separate account from which household expenses were paid, and raising two children together.[36]

Our decision in *Tolan v. Kimball* addressed a property dispute between a couple who dated and lived together for roughly eight years.[37] The woman purchased a house and titled it in her name only; the man testified that he contributed $3,600 to the down payment and closing costs.[38] He also testified that the couple chose not to place his name on the title because he had defaulted on a previous mortgage.[39] He paid the woman $200 per week, an amount greater than the monthly mortgage. The woman did not declare the payments as rent on her tax return.[40] Finally, the man made extensive home renovations demonstrating the "kind of significant planning and design decisions ... that only a homeowner would make." [41]

We affirmed the trial court's decision awarding one-half the value of the house to each party on the ground that it reflected the parties' intent to share the property equally.[42] We observed that the woman had later expressly refused the man's request to put his name on the title and stated that such refusal "could be an indicator of intent not to share an interest of the property," but we also noted that the woman had made statements suggesting that her refusal to place the man's name on the title was " 'a cunning, anticipatory design' " on her part alone, rather than an indicator of the parties' mutual intent.[43]

In this case it appears undisputed that Sarah contributed a Permanent Fund Dividend and her share of monies from the sale of a jointly-owned travel trailer to the downpayment on the house, yet the trial court concluded that Sarah and Elijah did not intend to share ownership of property as would a married couple. We cannot determine whether this conclusion is correct because there are no findings on several factors relevant to their intent.

The court found that Sarah and Elijah "did not title their property in joint title except for a vehicle that [Elijah] inherited from an uncle that [Sarah] put in both their names," and according to the parties' testimony, they neither kept joint bank accounts nor filed joint tax returns. The court also found that Elijah "provided the funds for many bills that were paid by [Sarah], though she acted as the household bookkeeper while they were together."

There was no finding whether Sarah contributed to the payment of household expenses.[44] According to both parties' testimony, Sarah would write herself a check on

---

**32.** *Id.* at 807.

**33.** *Id.*

**34.** *Id.*

**35.** *Id.* at 808.

**36.** *Id.* at 811.

**37.** 33 P.3d at 1152–53.

**38.** *Id.*

**39.** *Id.* at 1153.

**40.** *Id.*

**41.** *Id.* at 1154.

**42.** *Id.* at 1155–56. The superior court found the parties had formed an informal but express agreement that each party was entitled to one-half the value of the house. *Id.*

**43.** *Id.* at 1156 (quoting *Beal,* 577 P.2d at 509).

**44.** *See Bishop,* 54 P.3d at 811.

Elijah's account, have him sign it, and then pay the bills from her own checking account:

> Sometimes [checks for monthly bills would] all be written out of his bank account, and he would sign the checks, and sometimes they would get written out of my bank account, and we put money in. Sometimes they just got paid out of my bank account.

The evidence could support a finding that Sarah and Elijah maintained a de facto joint checking account from which both contributed to expenses, or that Sarah was merely a conduit through which Elijah paid the mortgage and household expenses.

The evidence showed that substantial improvements were made on the house during the time the parties cohabited, but the trial court's findings do not address whether Sarah contributed to the improvements or maintenance on the house.[45] Sarah contended she purchased materials and contributed a substantial amount of labor. Although she could not remember how many hours of work she put in, she stated that ninety percent of the renovations were completed by the time she moved out and that "30, 35% of whatever was cleared after the sale of that property" would be a fair estimation of her contributions in both cash and sweat equity. She stated that because she worked as a waitress, her earnings were primarily in cash and she was therefore unable to show how much money she contributed to the renovations. Elijah contended that he made the house improvements and that Sarah lacked the necessary skills to contribute.

The court further failed to find whether Sarah and Elijah held themselves out as husband and wife.[46] The court noted Elijah's testimony that Sarah would represent the couple as getting married but that he never intended marriage and would correct Sarah in front of others. The court did not state whether it credited this testimony, which Sarah contradicted.

Because the evidence is conflicting on key *Bishop* factors and because there are not sufficient findings to allow our review of its determination of the parties' intent, we vacate the property distribution decision and remand the issue to the trial court for further proceedings and additional factual findings.

## C. Child Support Issue

 The trial court entered a child support order requiring Sarah to pay Elijah about $400 per month. Sarah observes that the order does not account for child support she is allegedly owed for the period between July 2005, when the couple separated, and March 2007, when CSSD's child support order became retroactively effective. Because a parent is obligated to support his or her child regardless of whether a support order exists,[47] Sarah contends the court erred by failing to account for the child support allegedly owed her during the period between July 2005 and March 2007.

Sarah did not raise the issue of child support arrears for that period in her pre-trial pleadings or at trial.[48] The trial court granted custody to Elijah and ordered that "[i]f the parties cannot agree on the amount of child support, and if new child support guidelines affidavits are needed, then the parties are to prepare and file them," but there is no evidence Sarah raised the arrearage issue at that time. Her motion for reconsideration does not mention child support.

Because Sarah did not raise the issue of child support arrears in proceedings below, she has waived it.[49] We recognize that a

---

45. *See id.*

46. *See id.*

47. *Skinner v. Hagberg*, 183 P.3d 486, 489–90 (Alaska 2008).

48. Sarah states that Elijah "raised the issue of the [child support] start date during trial." However Elijah was referring to the 2007 date on which CSSD first charged him with child support obligations in discussing a $60 per

month credit to his obligation. This credit reduced his arrears for the period from September 2007 to February 2008 by roughly $360. Neither the notice of adjustment nor Elijah's testimony raised the issue of potential arrears for the period before Sarah contacted CSSD in March 2007.

49. *See Harvey*, 172 P.3d at 802 (holding that parent who listed cause of action for child support arrears in complaint but who submitted no motions on the claim and "failed to present evidence or request findings regarding past sup-

parent may not waive the right to receive child support payments by acquiescence or private agreement unless that agreement is approved by the court.[50] But when a parent does not assert a right to past-due support payments at trial, that right cannot be considered on appeal.

## V. CONCLUSION

The custody and child support orders are AFFIRMED. We VACATE the decision regarding property distribution and REMAND to the superior court for further proceedings and additional findings of fact and conclusions of law.

port during the custody hearing itself'' waived the claim).

**50.** *Paxton v. Gavlak,* 100 P.3d 7, 13 (Alaska 2004).