NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

# THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| LEONID K., | |
|            Appellant, | Supreme Court No. S-15790 |
| v. | Superior Court No. 3PA-12-00075 CN |
| STATE OF ALASKA, DEPARTMENT OF HEALTH & SOCIAL SERVICES, OFFICE OF CHILDREN'S SERVICES, | MEMORANDUM OPINION AND JUDGMENT[*] |
|            Appellee. | No. 1571 – March 9, 2016 |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Palmer, Kari Kristiansen, Judge.

Appearances: Gayle J. Brown, Anchorage, for Appellant. Ruth Botstein, Assistant Attorney General, Anchorage, and Craig W. Richards, Attorney General, Juneau, for Appellee.

Before: Stowers, Chief Justice, Fabe, Winfree, Maassen, and Bolger, Justices.

Leonid K.[1] appeals the termination of his parental rights to his daughter, Madisyn, an "Indian child"[2] under the definition set out in the Indian Child Welfare Act

---

[*] Entered under Alaska Appellate Rule 214.

[1] Pseudonyms are used to protect the family members' privacy.

[2] *See* 25 U.S.C. § 1903(4) (2015) (defining "Indian child").

(ICWA).[3] This is the third time this matter has been before us; attached as Appendix I and Appendix II are our first and second remand orders setting out the procedural history of the case, the factual and legal issues raised the first two times this matter came to us, and the sole legal issue remaining in this appeal. Our most recent remand was for the

---

[3] 25 U.S.C. §§ 1901–1963. ICWA establishes "minimum Federal standards for the removal of Indian children from their families and [for] the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture." 25 U.S.C. § 1902.

The grounds and standards for terminating parental rights are provided in Alaska Child in Need of Aid (CINA) Rule 18, governed primarily by Alaska Statutes, and also, in the case of an Indian child, by federal requirements under ICWA. *See* CINA Rule 18 (referencing requirements in AS 47.10.011, 47.10.080, and 47.10.086 and providing, in the case of Indian children, protocols under subsections (c)(2)(B) and (c)(4) comporting with ICWA, 25 U.S.C. § 1912(d) and (f), respectively).

Parental rights to an Indian child may be terminated at trial only if the Office of Children's Services (OCS) makes the following showings:

(1) OCS must show by clear and convincing evidence that: (a) the child has been subjected to conduct or conditions enumerated in AS 47.10.011; (b) the parent has not remedied the conduct or conditions that place the child at substantial risk of harm or has failed within a reasonable time to remedy the conduct or conditions so that the child would be at substantial risk of physical or mental injury if returned to the parent; and (c) active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family. CINA Rule 18(c)(1)-(2).

(2) OCS must show beyond a reasonable doubt, including qualified expert testimony, that continued custody of the child by the parent is likely to result in serious emotional or physical damage to the child. CINA Rule 18(c)(4).

(3) OCS must show by a preponderance of the evidence that the child's best interests would be served by termination of parental rights. CINA Rule 18(c)(3).

superior court to more fully explain the basis for its finding, by clear and convincing evidence, that Madisyn was a child in need of aid under AS 47.10.011(10).[4]

After remand the superior court held further evidentiary proceedings and issued a supplemental written decision outlining the evidence supporting its finding, by clear and convincing evidence, that Madisyn was a child in need of aid under AS 47.10.011(10). A copy of the superior court's decision is attached as Appendix III.

Leonid maintains his appeal, arguing that the superior court's finding is clearly erroneous. We have considered the evidence presented at the new evidentiary proceedings — and the superior court's credibility findings[5] — and conclude that the superior court's finding is not clearly erroneous. Accordingly, we AFFIRM the superior court's termination of Leonid's parental rights to Madisyn.

---

[4] AS 47.10.011(10) allows a trial court to find a child in need of aid if the parent "has been substantially impaired by the addictive or habitual use of an intoxicant, and the addictive or habitual use of the intoxicant has resulted in a substantial risk of harm to the child."

[5] "We give 'particular deference to the superior court's factual findings when they are based primarily on oral testimony, because the superior court, not this court, performs the function of judging the credibility of witnesses and weighing conflicting evidence.' " *Sarah D. v. John D.*, 352 P.3d 419, 435 n.65 (Alaska 2015) (alterations omitted) (quoting *Jaymot v. Skillings-Donat*, 216 P.3d 534, 539 (Alaska 2009)).

IN THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| L.K. (Father), | ) | |
| | ) | Supreme Court No. S-15790 |
| Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | **Order** |
| STATE OF ALASKA, DEPARTMENT | ) | |
| OF HEALTH & SOCIAL SERVICES, | ) | Date of Order: **June 24, 2015** |
| OFFICE OF CHILDREN'S SERVICES, | ) | |
| | ) | |
| Appellee. | ) | |
| | ) | |

Superior Court No. 3PA-12-00075 CN

Before:     Fabe, Chief Justice, Winfree, Stowers, Maassen, and Bolger, Justices.


**IT IS ORDERED**:

This appeal arises from the superior court's termination of L.K.'s parental rights to his daughter, M.K. The superior court first found by clear and convincing evidence that M.K. was a child in need of aid because (1) L.K. had abandoned M.K., as set forth in AS 47.10.011(1) and AS 47.10.013(a), and (2) L.K. had a substance abuse problem that "substantially impaired" L.K.'s ability to parent and led to "a substantial risk of harm" to M.K., as defined by AS 47.10.011(10).[1] L.K. argues that both of the superior court's findings that M.K. was a child in need of aid are clearly erroneous.

---

[1]     The superior court also made the other predicate findings for a termination of parental rights: failure to remedy by the parent; reasonable reunification efforts by the Office of Children's Services; and termination being in the best interests of the child. These findings are not at issue in this appeal.

We are unable to review either of the superior court's child in need of aid findings because there are insufficient findings on the underlying facts of the alleged abandonment and, with respect to substance abuse, of the alleged "substantial impairment" of L.K.'s ability to parent and the resulting "substantial risk of harm" to M.K. As OCS candidly states in its appellee brief, when L.K. became aware that he might be M.K.'s father was disputed at trial; this determination seems critical to the ultimate finding of abandonment under the facts of this case, but the superior court made no such determination.[2] Determinations about substantial impairment of L.K.'s parenting abilities as to M.K. and substantial risk of harm to M.K. — especially when OCS does not contend that L.K.'s parenting abilities as to his *son* are substantially impaired or that his *son* is subject to a substantial risk of harm and when, were M.K. placed with L.K., his son and M.K. would be in the same living environment — seem critical to the ultimate finding that L.K.'s substance abuse problem rendered M.K. a child in need of aid, but the superior court made no such determinations.[3]

We therefore REMAND this matter to the superior court for further elucidation of the basis for its child in need of aid findings. We leave it to the superior court to choose to make additional findings on the current record or to take additional evidence, but in either event supplemental findings should be transmitted to us within 60 days.

---

[2] *Cf. Jeff A.C., Jr. v. State*, 117 P.3d 697, 705 (Alaska 2005) (stating that we generally agree with the proposition that a parent cannot abandon a person or relationship the parent does not know exists).

[3] *See, e.g.*, *Barbara P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 234 P.3d 1245, 1259 (Alaska 2010) ("The CINA statute requires that a parent's ability to parent '*has been*' impaired by drug use and drug use '*has resulted*' in risk to the child at some time prior to the adjudication." (emphases in original) (quoting AS 47.10.011(10))).

We retain jurisdiction.

/s/ Marilyn May
Clerk of the Appellate Courts

IN THE SUPREME COURT OF THE STATE OF ALASKA

L.K. (Father),                                      )
                                                    )    Supreme Court No. S-15790
                         Appellant,                 )
                                                    )
          v.                                        )
                                                    )         **ORDER**
STATE OF ALASKA, DEPARTMENT                         )
OF HEALTH & SOCIAL SERVICES,                        )    Date of Order:  **September 2, 2015**
OFFICE OF CHILDREN'S SERVICES,                      )
                                                    )
                         Appellee.                  )
                                                    )
_____            )
Superior Court No. 3PA-12-00075 CN

> Before:      Stowers, Chief Justice, Fabe, Winfree, Maassen, and Bolger,
> Justices.

**IT IS ORDERED**:

1.      This appeal arises from the superior court's termination of L.K.'s parental rights to his daughter, M.K.  The superior court first found by clear and convincing evidence that M.K. was a child in need of aid because (1) L.K. had abandoned M.K., as set forth in AS 47.10.011(1) and AS 47.10.013(a), and (2) L.K. had a substance abuse problem that "substantially impaired" L.K.'s ability to parent and led to "a substantial risk of harm" to M.K., as defined by AS 47.10.011(10).[1]  L.K. argues on appeal that both of the court's findings that M.K. was a child in need of aid are clearly erroneous.

---

[1]      The superior court also made the other predicate findings for a termination of parental rights:  failure to remedy by the parent; reasonable reunification efforts by the Office of Children's Services; and termination being in the best interests of the child. These findings are not at issue in this appeal.

2.     By order dated June 24, 2015 we remanded this matter to the superior court because we were unable to review either of the court's child in need of aid findings — there were insufficient findings on the underlying facts of the alleged abandonment and, with respect to substance abuse, of the alleged substantial impairment of L.K.'s ability to parent and the resulting substantial risk of harm to M.K.  As we noted:  when L.K. became aware that he might be M.K.'s father was disputed at trial — and seemed critical to the ultimate finding of abandonment under the facts of this case — but the superior court made no such determination;[2] whether there was substantial impairment of L.K.'s parenting abilities leading to substantial risk of harm to M.K. was also disputed — and also seemed critical to the ultimate finding that L.K.'s substance abuse problem rendered M.K. a child in need of aid — but the superior court again made no such determinations.[3]

3.     On July 9, 2015 the superior court entered its Additional Findings of Fact and transmitted them to us.  The parties were given an opportunity to file supplemental briefing with respect to the superior court's Additional Findings of Fact.

4.     The superior court found that L.K. became aware of M.K.'s existence on October 28, 2013.  Apparently recognizing that this date conflicted with its earlier finding of abandonment under AS 47.10.011(1) and .013(a), the court seems to have found abandonment under AS 47.10.013(a)(4), which provides that a court may find

---

[2]     *Cf. Jeff A.C., Jr. v. State*, 117 P.3d 697, 705 (Alaska 2005) (stating that we generally agree with the proposition that a parent cannot abandon a person or relationship the parent does not know exists).

[3]     *See, e.g.*, *Barbara P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 234 P.3d 1245, 1259 (Alaska 2010) ("The CINA statute requires that a parent's ability to parent '*has been*' impaired by drug use and drug use '*has resulted*' in risk to the child at some time prior to the adjudication." (emphases in original) (quoting AS 47.10.011(10))).

abandonment when a parent has "failed to participate in a suitable plan or program designed to reunite the parent . . . with the child." In its supplemental briefing to us, OCS urges us to affirm the abandonment finding on this ground. We cannot agree.

The superior court's original termination order and the court's additional findings of fact do not include a specific finding that L.K. failed to participate in his case plan. In its additional findings the superior court admonished L.K. for failing "to put in extra time and attention in order to bond with M.K.," noting L.K.'s missed visits, quickness to anger, lack of engagement during parenting classes, hostility to OCS employees, and failure to establish a bond with M.K. But our review of the record reveals that after his case plan was finally developed, L.K. submitted to psychological evaluation and substance abuse assessments, had 19 visits with M.K., and attended seven parenting classes. Although L.K. may not have yet progressed to having a strong bond with M.K., any implicit finding that L.K. abandoned M.K. because he failed to "even minimally participate"[4] or "failed to comply with several important aspects of his case plan"[5] is clearly erroneous.

Accordingly, we REVERSE the superior court's finding that M.K. was a child in need of aid due to abandonment.

5. The superior court neglected to address our request for explanation of its AS 47.10.011(10) "substance abuse" finding, specifically neglecting to discuss the statutory elements of substantial impairment of parental abilities and substantial risk of

---

[4] *A.B. v. State, Dep't of Health & Soc. Servs.*, 7 P.3d 946, 951 (Alaska 2000).

[5] *Sherman B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 310 P.3d 943, 950 (Alaska 2013).

harm to M.K.[6]   We therefore again REMAND this matter to the superior court for further elucidation of the basis for its AS 47.10.011(10) "substance abuse" child in need of aid finding.  We leave it to the superior court to choose to make additional findings on the current record or to take additional evidence, but in either event supplemental findings should be transmitted to us within 60 days.

We retain jurisdiction.

Entered by direction of the court.

/s/ Marilyn May
Clerk of the Appellate Courts

---

**[6]**   *See Barbara P.*, 234 P.3d at 1259 (affirming CINA finding that mother's drug use during pregnancy had harmed child and mother's continued drug use impaired parenting ability).

IN THE SUPERIOR COURT FOR THE STATE OF ALASKA
THIRD JUDICIAL DISTRICT AT PALMER

| | | |
|---|---|---|
| In the matter of: | ) | |
| | ) | |
| M. K., | ) | Case No. 3PA-12-00075 CN |
| | ) | |
| A Child Under the Age of | ) | |
| Eighteen (l8) Years | ) | |
| | ) | |

**SUPPLEMENTAL FINDINGS OF FACT AND CONCLUSIONS OF LAW PURSUANT TO REMAND ORDER DATED SEPTEMBER 2, 2015[*]**

On September 2, 2015, the Alaska Supreme Court issued an Order reversing this Court's November 18, 2014 findings of abandonment under AS 47.10.011(1) and AS 47.10.013(a) and remanding this matter for further findings establishing whether M.K. is a child in need of aid under the parental substance abuse provision, AS 47.10.011(10). The Alaska Supreme Court retained jurisdiction over this matter and ordered findings be remitted by November 2, 2015. This Court was unable to make additional findings based on the existing record and took additional testimony and evidence on October 5 and 8, 2015, for the limited purpose of establishing whether M.K. is a child in need of aid pursuant to AS 47.10.011(10).

Nine witnesses testified: L.K., father; C.K., mother; Dr. Tamara Krimm, pediatrician; Dr. Michael Rose, clinical psychologist; Jolene Howes, father's probation officer; Thomas Schramm, OCS family unit supervisor; Lori Houston, LCSW; M.T., mother's friend and visitation supervisor; and B.K., father's wife. Houston was qualified

---

[*] This decision has been edited to conform to the technical rules of the Alaska Supreme Court, and internal citations have been omitted.

as an expert in child and family therapy and child welfare. Dr. Krimm was qualified as an expert in child pediatric care. Dr. Rose was qualified as an expert in clinical psychology.

Based on the testimony presented, this Court makes additional findings of fact and conclusions of law. These findings supplement and rely on the Court's November 18, 2014 findings, specifically relying on facts presented in paragraphs 8-16. In some instances, the Court heard testimony that was new, more credible, more specific, and/or more detailed than that presented at trial and modifies its prior factual findings to conform with the best evidence presented. This includes new information detailing L.K.'s knowledge of C.K.'s pregnancy and his paternal relationship to M.K. relevant to establishing the relationship between L.K.'s substance abuse, paternal role, and risk of harm to M.K. Accordingly, the Court finds that the supplemental July 9, 2015 findings at paragraph 1 are clearly erroneous; these findings specifically supplement the November 18, 2014 parental notice findings located at paragraphs 5-6. The Court also heard from multiple credible expert witnesses not called during trial and now interprets the evidence in light of their expert opinions. The following supplemental conclusions of law clarify the Court's prior conclusions based on the total record before this Court.

## FINDINGS OF FACT

1. M.K. and her maternal half-sisters were each placed with foster parents through CINA proceedings. The foster parents have since adopted all three girls.

**L.K.'s Knowledge Of Paternity**

2. C.K. testified credibly that she was dating and living with L.K. when she became pregnant with M.K. When C.K. suspected she was pregnant, she took a home pregnancy test. L.K. was there when she took the test. It came back positive. C.K. knew that L.K. was the baby's father. These events occurred in June 2011 during the first month of her pregnancy.

3. Both C.K. and L.K. were excited to have a baby together. They discussed living together as a family with the new baby and with C.K.'s older daughter, who was in OCS custody but with whom C.K. hoped to be reunified. L.K. and C.K. told numerous people that they were expecting a baby together, including his mother, her mother, her aunt, her cousin, and M.T. L.K. and C.K. discussed what to name their new baby. If it was a boy, L.K. wanted to give him a certain name. L.K. later gave that name to his son (by his now-wife B.K.).

4. M.T. — who was then foster mother to C.K.'s older daughter and a mentor to C.K. — testified credibly that she saw C.K. and L.K. at a community visit when C.K. was approximately four months pregnant with M.K. C.K. was visibly pregnant and introduced L.K. to M.T. as the baby's father. They all discussed the pregnancy and the baby's future. Both C.K. and L.K. appeared to be under the influence of drugs during the community visit. M.T. advised C.K. and L.K. that they had to stop using drugs, and that if the baby was born addicted, OCS would assume custody. C.K. and L.K. said they were both trying to get clean.

5. L.K. rebutted M.T.'s testimony, testifying unconvincingly that he did not know C.K. was pregnant with his child. When asked whether he knew she was pregnant when the two of them visited with M.T., he stated: "I don't think so." When asked whether he could see that she was pregnant at that visit, he said: "No idea at all." When asked if he remembered being with M.K. when she took the home pregnancy test, he stated: "No, I don't remember." He was not a credible witness. His general denial of any knowledge about the baby is inconsistent with the testimony of both C.K. and M.T., who were considerably more credible in demeanor and offered specific and detailed testimony establishing L.K.'s knowledge that C.K. was pregnant with his child.

6. Based on the credible testimony of C.K. and M.T., this Court finds that L.K. knew that C.K. was pregnant with his child by the time that C.K. was two months pregnant.

**M.K.'s Exposure To Substance Abuse *In Utero* And Before Removal**

7. C.K. testified openly that she has a longstanding, significant substance abuse problem. She began abusing pain pills at the age of 13 and went on to use marijuana, alcohol, methamphetamines, and bath salts. By 2011, she was using bath salts nearly every day. C.K.'s substance abuse treatment records, medical records, and criminal records, which were admitted at the October 2015 hearing, support C.K.'s testimony about the severity of her drug problem.

8. C.K. testified that she ceased using drugs as soon as she learned she was pregnant. But M.T. testified that she believed that C.K. was under the influence of drugs at the community visit when C.K. was approximately four months pregnant with M.K. M.T. described C.K. as exhibiting numerous physical and mental signs of intoxication: she was jittery, her speech was unclear, she avoided eye contact, and she had sores on her arms. M.T. knew C.K. well and had observed these same symptoms in the past when C.K. was under the influence of drugs. M.T. also testified that she spoke with C.K. and L.K. about their drug use and they admitted that they were both still using. M.T.'s testimony was highly credible. Based on this testimony, the Court finds that C.K. continued to use drugs after she knew she was pregnant with M.K.

9. M.K. was exposed to drugs *in utero*. Her mother regularly used bath salts during the first and second trimesters of pregnancy. L.K. knew that C.K. was pregnant with his child and that she had a significant, untreated drug problem, and he encouraged her addictions.

10. L.K. also did not stop using drugs after learning that C.K. was pregnant. He would use drugs daily and in C.K.'s presence. He continued to offer her

drugs, knowing that she was pregnant with his child and that she wanted to stop using drugs to protect the baby.

11. C.K. described her home life with L.K. as almost that of a prisoner. She was expected to stay in his bedroom, where L.K. kept drugs, used them daily in her presence, and offered them to her.

12. Mr. Schramm, OCS Protective Services Specialist IV and family unit supervisor, testified that it is much more difficult for someone to get clean and stop using drugs when the people around them continue to abuse drugs and participate in the drug culture. Observing the people around them use drugs or being offered or coerced into continuing to use often causes a person to fall back into old addictive habits. An addict may be particularly vulnerable to relapse when a romantic partner continues to use drugs. For this reason, drug treatment programs recommend that, in order to maintain sobriety, recovering addicts discontinue associations with drug users in order to eliminate access to drugs, opportunities to use, and pressure to use.

13. The Court finds that L.K. contributed to C.K.'s drug use while pregnant and therefore contributed to M.K.'s prenatal exposure to drugs.

**L.K.'s History Of Substance Abuse During The Pregnancy And Parenting**

14. Consistent with his prior testimony, L.K. continued to deny that he has a history of substance abuse or a current substance abuse problem. The Court did not find his testimony credible. C.K. and L.K. frequently used drugs together. L.K. admitted to using bath salts with C.K. on an occasion that led to hospitalization. C.K. testified that when L.K. used drugs, he would "act crazy" and out of control.

15. C.K. and L.K. dated for approximately six months. They lived together from the beginning in L.K.'s parents' home. L.K. instructed C.K. to remain in his basement room while he went to work, and she did. During their relationship, C.K.

and L.K. used bath salts together. She frequently saw him shooting up "roxies" (prescription pain pills) and snorting bath salts.

16. C.K. left L.K. during her pregnancy after an incident in which L.K., high on drugs and "acting crazy," pinned her down on the bed against her will. She realized that the relationship was not healthy and she wanted more for herself and her unborn baby. C.K. told L.K. she was going out to smoke a cigarette, and then walked away from the house. She walked for miles and took nothing but the clothes on her back.

17. After C.K. left the relationship, she never heard from L.K. again, with the exception of one unpleasant message he sent to her on Facebook calling her nasty names. He never contacted her to ask about her pregnancy or the baby, to offer financial support for the child, or to attempt to develop a relationship with the baby. The couple have mutual friends, and L.K. could have located C.K. if he had wanted to do so.

18. L.K. was taking the narcotic replacement drug suboxone during his supervised visits with M.K. During a parenting class, L.K. sucked on a suboxone tablet for the first half of the class.

19. L.K.'s untreated substance abuse problem was a significant factor in his inability to bond with M.K. during visits with her.

20. While L.K.'s suboxone medication is managed through medical providers, it is extremely troubling to the Court that he has declined to seek an evaluation by a physiatrist specializing in pain management who could differentiate between L.K.'s real medical problems and his history of substance abuse, as recommended by Dr. Rose.

**Risks Posed To M.K. By L.K.'s Substance Abuse**

21. M.K. is three-and-a-half years old and has special needs. She has been diagnosed with an adjustment disorder and sensory problems and was referred to a specialist for occupational therapy. Past trauma has decreased her level of functioning.

M.K. has extreme difficulties with self-regulation. She is anxious, clingy, uncomfortable around new people, has difficulty forming bonds with others, has a temper, can be erratic, unstable, and irritable, has trouble dealing with changes in routine, and easily becomes emotional and prone to meltdowns.

22. Dr. Krimm was qualified as an expert in child pediatric care and testified credibly about the impacts of drugs on children's lives and needs. Children exposed to substances like bath salts *in utero* are more likely to develop sensory and emotional special needs later in life, and these problems can develop at any point in a child's life. Children exposed *in utero* often develop their own substance abuse problems as teenagers and are more likely to abuse substances without appropriate intervention. Mr. Schramm testified that children exposed to substances *in utero* who display the kinds of behaviors M.K. is displaying can be inconsolable and require a safe and sober caretaker who understands and can manage their special needs. Dr. Rose testified that a parental history of substance abuse — whether ongoing or in untreated remission — can disturb cognitive functioning and prevent the formation of a relationship with a child with special needs like those of children exposed to substances *in utero*.

23. Based on Dr. Krimm's expert testimony, M.K. remains at ongoing heightened risk of developing a substance abuse problem and this risk would be exacerbated by exposure to individuals with untreated substance abuse, including L.K.

24. Based on Dr. Krimm's and Ms. Houston's expert testimony, as well as Mr. Schramm's testimony, the Court finds that a stable home environment, consistency in parenting, and significant parental outlays of time and effort to work with her sensory problems are critical to address M.K.'s special needs. M.K. needs parents who are highly functional. She needs parents who have insight into her needs and can help her identify her emotions, regulate them, and form trusting bonds with adults. She

needs caregivers with realistic expectations of her. M.K.'s adoptive parents fall into that category. L.K. does not.

26. Based on the expert testimony of Dr. Krimm, Dr. Rose, Ms. Houston, and the testimony of Mr. Schramm, M.K. would be at further risk if placed with a caregiver with an untreated substance abuse problem. Given her temper, irritability, and acting out, there is also concern that a drug-using parent would not be able to handle her behaviors, increasing the risk of physical or emotional abuse. If a caregiver is not even able to be in tune with his own problems, he is unlikely to be able to be in tune with his child's needs.

26. Based on the expert testimony of Dr. Krimm, Dr. Rose, and Ms. Houston, as well as Mr. Schramm's testimony, the Court finds that a parent with untreated substance abuse problems poses risk to a child, especially a child with special needs like M.K.'s. Drug use is correlated with abuse and neglect of children. When under the influence, judgment and self-control are compromised; drug-related impairment can lead to injuries, abuse, and neglect. Untreated substance abuse can prevent parents from being in tune with their child's needs and recognizing important non-verbal signals of distress or need. Drug users may not be able to recognize a child's special needs and be properly attentive to them or to put the time and work necessary into providing a consistent, loving home in which the child's needs are put first. Parents who have completed treatment and gained insight into their substance abuse problems are more receptive to their children's needs, more connected to their children, and better able to meet those needs.

27. L.K. remains in deep denial about his substance abuse problem and was unable to provide the Court with any level of certainty that his court-ordered substance abuse and parental programming resulted in real learning or changes in thought or behavioral patterns. L.K. has had significant time throughout this litigation

to comply with the treatment recommendations of Dr. Rose and with prior orders for substance abuse and parenting programming. L.K.'s participation has been minimal beyond attendance, and there is little to suggest that L.K.'s outlook or behaviors have benefitted. In refusing to acknowledge M.K.'s troubles, L.K. places his own needs above M.K.'s in a way that is destructive and short-sighted for a child already exhibiting special needs. L.K.'s denial of his past and ongoing substance abuse, coupled with denial about M.K.'s special needs, are especially dangerous to M.K. and increase her risk of following in the path of both her parents.

28.     The Court finds that M.K.'s needs differ significantly from the needs of her paternal half-brother based on M.K.'s *in utero* substance exposure and L.K.'s contribution to her exposure. M.K. demonstrates behaviors that reinforce a finding that M.K. faces serious risks and consequences posed by L.K.'s history of substance abuse and ongoing denial that are not shared by her paternal half-brother.

## CONCLUSIONS OF LAW

29.     The Court finds by clear and convincing evidence that M.K. is a child in need of aid because L.K.'s ability to parent has been substantially impaired by the addictive or habitual use of an intoxicant resulting in a substantial risk of harm to M.K. pursuant to AS 47.10.011(10). L.K. contributed to M.K.'s prenatal substance exposure. L.K.'s ongoing denial of his past substance abuse, his refusal to seek recommended substance abuse assessments and treatment, and his denial about M.K.'s special needs place M.K. at substantial risk of harm, including worsening psychological and developmental symptoms and substance abuse.

DATED at Palmer, Alaska, on October 26, 2015.


/s/ Kari Kristiansen
Superior Court Judge