DeAnn TOLAN, Appellant,

v.

Gary KIMBALL, Appellee.

No. S–9374.

Supreme Court of Alaska.

Oct. 19, 2001.

Vincent Vitale, Anchorage, for Appellant.

Allison E. Mendel, Penny Agallianos, Mendel & Associates, Anchorage, for Appellee.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

*OPINION*

PER CURIAM.

1. DeAnn Tolan and Gary Kimball began dating in 1989. In April 1990 Tolan purchased, with the title issued in her name only, a single-family house on Ruth Drive in Wasilla. According to Kimball, the Ruth Drive house was purchased with the intention that Tolan and Kimball would share the home; accordingly he gave Tolan approxi-

mately $3,600 toward the down payment and closing costs of the house. Tolan moved into the house in April 1990 and Kimball moved in shortly thereafter. They lived together in that home until Tolan asked Kimball to leave in December 1997, remaining unmarried throughout.

2. Kimball testified at trial that the parties elected not to place his name on the title of the house because he had defaulted on his previous mortgage. According to Kimball, the parties agreed at that time that they would add his name to the title as soon as his credit was cleared.

3. From the purchase of the property in 1990 until the parties' separation in December 1997, the property's value increased from $66,000 to $168,000. The parties dispute the cause of the $102,000 increase. Tolan attributes $88,000 of the increase to an improved real estate market in the Mat–Su Valley. Kimball cites his investments of labor and materials used in making extensive renovations and improvements on the property. These improvements include replacement of a collapsed porch with an enclosed addition, and construction of a shed, a greenhouse, decks, a wood workshop, and a two-car garage.

4. The parties disputed the source of the funds used to purchase the building materials. Tolan testified that she had paid for all materials from her cash savings regardless of who made the actual purchase or held onto the receipt. Kimball claimed at trial to have paid for or salvaged from his prior home nearly all of the building materials, which totaled approximately $40,000 in value. The superior court disbelieved both accounts and found it "[m]ost likely [that] the parties pooled their cash in roughly equal amounts to pay for the improvements."

5. Kimball, who kept his retirement savings in cash in the parties' bedroom, dealt mainly in cash and only occasionally wrote checks. Although she was employed as a financial planner, Tolan also claimed to keep a substantial cash fund in the bedroom. Tolan testified that she ordinarily wrote checks for regular expenses. She also used automatic payroll deductions for her 401(k) and insurance premiums.

6. During the course of their cohabitation, Kimball paid Tolan $200 per week, a figure which exceeded the monthly mortgage, tax and insurance payments. These payments were commonly in cash, although they were occasionally paid by check. Kimball testified that such payments were "towards mortgage and bills and ... whatever it was needed for." Tolan notes, however, Kimball made no direct payments on the mortgage. Tolan paid for all utility bills, most of the food purchases, and most of the vehicle costs. Tolan did not report Kimball's weekly cash contributions as rent on her tax returns.

7. On two occasions—in 1992 or 1993 and in 1994—Tolan refused Kimball's requests to put his name on the deed, explaining that she "didn't want him on any of [her] credit or financial obligations."

8. After their separation, Kimball filed suit in superior court alleging that "[i]n the course of their domestic partnership, plaintiff and defendant acquired property together, improved their joint property, commingled their property, and acquired partnership assets and debts, including but not limited to real estate, personal property and a mortgage." Kimball's amended complaint presented six theories of recovery: partnership dissolution; breach of express contract; breach of implied contract; resulting trust; constructive trust; and reformation of deed and partition of real property.

9. On August 25, 1999, Superior Court Judge Dan A. Hensley issued a decision and order in which he found that the parties had made "an informal, express agreement under which Tolan considered [Kimball's] contributions of cash and labor as an 'investment' in the house equal to one-half its value." The court dismissed Kimball's other claims, finding that the contract provided an interest in the appreciation of the value to the home but not for an interest in the title. In addition, the court dismissed Tolan's counterclaims for waste, negligence, and breach of contract. After settling several claims to the personal property contested by the parties, the court awarded Kimball one-half the net value of the home at the time he departed. After

several adjustments, the court entered judgment for Kimball in the principal amount of $41,199.50.

10. Tolan now appeals.

11. Citing our opinion in *Wood v. Collins*,[1] the superior court held that the parties made an informal, express agreement according to which each party was entitled to one-half the value of the house. Judge Hensley supported this conclusion with factual findings based on the testimony presented at trial. In particular, the court was persuaded by the following factors: (1) Kimball paid Tolan $200 per week in cash; (2) over the eight years of their relationship, "Kimball contributed hundreds of hours of labor making additions and improvements to the property"; (3) Tolan told her friend Debbie Richter that she considered Kimball's weekly payments to be contributions toward the mortgage and that Kimball had an "investment" in the house; (4) Tolan "allowed [Kimball] to make the kind of significant planning and design decisions regarding [the] improvements that only a homeowner would make"; and (5) "although Tolan insisted at trial that Kimball was only a tenant, she did not declare Kimball's monthly payments as rent on her tax returns."

■ 12. On appeal Tolan argues that, for several reasons, the superior court erred in holding that the parties formed a contract regarding the ownership of the Ruth Drive house. But in order to affirm the judgment of the superior court we need not hold that a contract between the parties existed.[2] Rather, we follow *Wood* and the Oregon Supreme Court decision in *Beal v. Beal*[3] and hold that because property accumulated during a period of cohabitation should be divided according the parties' intent, the judgment of the superior court, which is supported by record evidence regarding the parties' intent, was not error. Because Tolan's appellate arguments primarily address various aspects of contract law, but do not challenge the notion that Tolan and Kimball intended to share equally in the house, they are not relevant.[4]

■ 13. In *Wood* we addressed the question of whether, in dividing property acquired during the course of a relationship between unmarried cohabitants, the superior court correctly credited the man with one-half of the payments he had individually made on a condominium owned by the two parties as tenants in common.[5] We held that as a matter of law the superior court correctly concluded that "for unmarried cohabitants, the intent of the parties will control division for property acquired before separation."[6] We remanded there because the record did not support the superior court's factual finding that the parties mutually intended to share expenses incurred while in the relationship.[7]

14. In *Wood* we relied heavily on *Beal*, in which Oregon adopted the rule that property accumulated during cohabitation should be determined by the express or implied intent

---

1. 812 P.2d 951 (Alaska 1991).

2. *See In re A.B.*, 791 P.2d 615, 621 n. 9 (Alaska 1990) (noting that this court "may affirm a lower court's decision without embracing the reasoning employed in it").

3. 282 Or. 115, 577 P.2d 507 (1978).

4. Tolan argues, citing *Sykes v. Melba Creek Mining, Inc.*, 952 P.2d 1164, 1167 (Alaska 1998), that the essential elements of a contract were not present: there was no offer encompassing the essential terms of a contract; there was no unequivocal acceptance; no consideration was defined; and there was no mutual intent to be bound. But we affirm under *Wood* and *Beal*, which ask what the parties intended, not whether they formed a contract. Therefore these arguments are irrelevant.

Tolan also argues that the trial court failed to apply the clear and convincing evidence standard as is required for proof of an oral contract to convey an interest in land. Again, because this argument applies only in a contract setting, it is not persuasive.

Tolan also contends that the statute of frauds bars the contract. Because the statute of frauds is a defense to contract cause of action only, it is not relevant to our analysis under *Wood*.

Tolan also argues that the superior court erred by dismissing her breach of contract counterclaim. Because this claim also depends on the existence of a contract between the parties, it is not relevant to our holding.

5. *See Wood*, 812 P.2d at 955–57.

6. *Id.* at 957.

7. *See id.*

of the parties. We described the facts and lower court proceedings of that case:

> Barbara and Raymond Beal, recently divorced, purchased property together, listing themselves as husband and wife. Both contributed to the down payment, Barbara paying $500 more. Barbara made the first monthly payment; Raymond made all subsequent payments. The parties lived together in the house, both contributing to the household. After two years, Barbara moved out. Raymond remained and made all monthly payments on the house. The court decided the property dispute should be resolved by looking at the parties' intent. Before Barbara moved out, the trial court found that the parties intended to pool their resources for their common benefit. Therefore, both parties were held to have an undivided interest in the property.[8]

Rejecting the rules of cotenancy, under which the parties would have been required to share expenses based on ownership share, the *Beal* court stated that

> a division of property accumulated during a period of cohabitation must be begun by inquiring into the intent of the parties, and if an intent can be found, it should control that property distribution. While this is obviously true when the parties have executed a written agreement, it is just as true if there is no written agreement. The difference is often only the sophistication of the parties. Thus, absent an express agreement, courts should closely examine the facts in evidence to determine what the parties implicitly agreed upon.
>
>  . . . .
>
> In summary, we hold that *courts, when dealing with the property disputes of a man and a woman who have been living together in a nonmarital domestic relationship, should distribute the property based upon the express or implied intent of those parties.*[9]

■ 15. We reaffirm our approval first stated in *Wood* of the *Beal* rule that, to the extent it is ascertainable, intent of the parties should control the distribution of property accumulated during the course of cohabitation.[10] Hence the trial court was correct to follow *Wood* and *Beal* in looking to the intent of the parties to resolve the disputes regarding the property·acquired during their relationship. In addition, the factual findings of the superior court are well supported by the record and present a compelling case that the parties intended to share the equity in the home equally.

■ 16. As the *Beal* court explained, in cases such as this one, "inferences can be drawn from factual settings in which the parties lived."[11] Here, both parties contributed to the down payment and both made financial contributions to the upkeep of the house throughout their cohabitation. Tolan argues on appeal that Kimball was Tolan's tenant and his weekly payments were understood to be rent. But we believe that the superior court did not err in rejecting Tolan's version based on the fact that she never claimed the payments as rent on her tax returns, on the fact that "Tolan needed Kimball's $200 per week to help pay ... expenses, including the mortgage," and on the testimony of Tolan's friend that Tolan confided to her that she considered the payments to be contributions to the mortgage.

17. Also compelling evidence of the parties' intent is the extensive renovations which Kimball performed with neither direction from Tolan nor expectation ·of payment. As the trial court found, "[Tolan] encouraged him to spend hundreds of hours making improvements in the property, and allowed him to make the kind of significant planning and design decisions regarding the improvements that only a homeowner would make."

■ 18. Tolan argues that her repeated refusals to add Kimball's name to the title to the property, as Kimball requested, demonstrate that she did not intend that the property be jointly owned. Under this view, if both parties had intended to share the prop-

---

**8.** *Id.* at 956.

**9.** *Beal,* 577 P.2d at 510 (emphasis added) (*quoted* in *Wood,* 812 P.2d at 956).

**10.** *See Wood,* 812 P.2d at 956 (agreeing with *Beal* that "[p]roperty accumulated before separation should be divided by determining the express or implied intent of the parties").

**11.** *Beal,* 577 P.2d at 510.

erty equally, they would have formalized that intent by adding Kimball to the title. But we, as did the *Beal* court, reject "[t]he unannounced but inherent rule ... that the party who has title, or in some instances who is in possession, will enjoy the rights of ownership of the property concerned."[12] That rule is unfair, for it "tends to operate purely by accident or perhaps by reason of the cunning, anticipatory designs of just one of the parties."[13] Though we reject a rule that title or possession equals ownership, Tolan raises a valid point that an express refusal to add Kimball's name to the title could be an indicator of intent not to share an interest of the property. But here a disinterested witness, Debbie Richter, testified that Tolan "made a comment one time that [Kimball] was stupid for putting all of his cash into a house that his name was not on the title to" and stated that "since [Kimball] paid in cash, [he] had no proof that he was anything other than a tenant." Thus the trial court did not err by discounting Tolan's failure to put Kimball's name on the title. Tolan's refusal appears, in light of Richter's testimony, to be a "cunning, anticipatory design[ ] of just one of the parties," rather than an indicator of the parties' mutual intent.[14]

19. For these reasons, we AFFIRM the judgment of the superior court.

---

**12.** *Id.* at 509.

**13.** *Id.*

**14.** *See id.*