Cathy M. FROST, Appellant/Cross–Appellee,

v.

John S. SPENCER, Appellee/Cross–Appellant.

Nos. S–12577, S–12587.

Supreme Court of Alaska.

Oct. 16, 2009.

Michael A. Grisham, Allen Clendaniel, Dorsey & Whitney LLP, Anchorage, for Appellant/Cross–Appellee.

Robert C. Erwin, Palmier & Erwin, LLC, Anchorage, for Appellee/Cross–Appellant.

---

**27.** *See supra* note 17.

**28.** *Pierce v. Pierce,* 949 P.2d 498, 500 (Alaska 1997).

Before: FABE, Chief Justice,
MATTHEWS, EASTAUGH, CARPENETI,
and WINFREE, Justices.

*OPINION*

PER CURIAM.

## I. INTRODUCTION

Cathy Frost and John Spencer, friends who were at times romantically involved, ran a business together from the late 1980s to the early 2000s. When their working relationship deteriorated, Spencer sued for division of the partnership property under the law of domestic relations. Frost agreed to a dissolution of their business partnership under a framework for the "equitable distribution" of assets and liabilities. But after trial the superior court declared that it was bound instead to resolve the case under partnership law. The court permitted the parties to submit written responses to its ruling but declined to hold another evidentiary hearing before issuing a final decision. Frost appeals on several grounds. Because Frost should have had the opportunity to present evidence after the court announced that different law governed the case, we reverse the superior court's denial of Frost's request for a supplemental evidentiary hearing and remand for further proceedings.

## II. FACTS AND PROCEEDINGS

Cathy Frost and John Spencer, friends since high school, started a business together in 1988 or 1989. That business, called Footloose Alaska, initially provided guided hunting expeditions and then expanded to offer catered events, including weddings. Frost and Spencer acquired real property in Girdwood, the Raven Glacier Lodge, as a location to house clients before flying them to remote areas for hunting trips and for use as the site of their catered events. That property was titled in Spencer's name because of residual financial complications from a prior business in which Frost had been a partner with her deceased husband, but the parties agree that they purchased the lodge together. Frost and Spencer also purchased Farewell Lake Lodge from Frost's parents. The two partners had different roles in running Footloose Alaska: Spencer "did all the flying and bush logistics and guiding, the carpentry, architectural work, landscaping, aircraft repair and maintenance," and Frost "did the marketing, the food service, [and] the public relations." The record does not indicate that they had a written partnership agreement.

Before and at the beginning of the business partnership, Frost and Spencer were "sporadically" romantically involved. There is no evidence in the record, nor does either party now assert, that they ever lived together.

By 2003 Frost and Spencer no longer had a functioning professional relationship.[1] In February 2005 Spencer filed a complaint against Frost requesting a "dissolution of the parties' partnership interests" and a "division of their jointly acquired real and personal properties." The complaint stated that "[i]n 1985, the parties entered into a personal relationship and during the course of same, acquired, as partners, real property, personalty and incurred certain indebtedness," but now "[t]he parties' personal relationship has terminated." In response, the superior court served the parties with a domestic relations procedural order. The case proceeded as though it concerned a domestic partnership, at first because the court apparently thought Spencer had properly characterized it as such,[2] and later because the parties agreed to treat it as some kind of domestic relations case even after the court recognized the error. That agreement was explicit: during trial, Spencer's attorney noted on the record

---

1. The parties offered different explanations for the breakdown of their partnership: Spencer complained of being denied information about bookings for events at Raven Glacier Lodge, and as a result being unable to file tax returns for the business, as well as being locked out of the lodge; Frost claimed that Spencer stopped contributing services to the business and denied deliberately locking him out.

2. Early in the proceedings, Spencer's attorney told the court that it was correct to resolve the case as though the partnership were domestic, even claiming that the parties had lived together.

Frost filed her answer pro se and appears to have remained unrepresented until January 2006, almost a year after Spencer filed his complaint.

that he would not present evidence to prove that the partnership was domestic because Frost had accepted that classification in her amended trial brief; that brief expressly adopts Spencer's description of the matter by stating that "Mr. Spencer has asked for an equitable dissolution and Ms. Frost agrees." [3]

In May 2006, after preliminary proceedings largely regarding the liability insurance on and possession and maintenance of Raven Glacier Lodge, the case went to trial. The court informed the parties that each side would have three hours and forty-five minutes total to present its case. As the case progressed, the court clerk kept track of time, and at several breaks the court reported to the parties how many of their allotted minutes they had used. Frost made motions for more time during and after the trial, which the superior court denied, and at other points Frost and her attorney noted that the time was insufficient to present all the evidence they wanted to put before the court.

Spencer served as the main witness on his own behalf. After answering preliminary questions about his personal background, he described the acquisition and maintenance of several planes that he believed were his property but Frost argued were partnership assets. He answered questions about the purchase of the real property Footloose Alaska used, as well as loans he and Frost had received from the bank and family members to begin the business. He also testified to small expenditures he had made out of personal funds for the benefit of Footloose Alaska. Frost's attorney asked Spencer on cross-examination about his work for the business, tax refunds he received in years Footloose Alaska lost money, and the status of the title to Raven Glacier Lodge.

Spencer's attorney called several additional witnesses. Four appraisers testified to the values of Farewell Lake Lodge, Raven Glacier Lodge, personalty at Raven Glacier Lodge, and airplanes Spencer owned while Footloose Alaska was in operation. David

William Spencer, John Spencer's younger brother, testified that Spencer put significant effort into Footloose Alaska and that David had made loans totaling approximately $15,000 to Spencer and $25,000 to Footloose Alaska, none of which had been repaid.

Frost also put on witnesses. A seasonal employee at Raven Glacier Lodge testified about the amount of work Frost and Spencer put into Footloose Alaska while he worked there, describing the shifting focus of the business toward weddings rather than guiding hunts, as well as Spencer's decreasing involvement in the early 2000s. Frost's mother took the stand to state that she and her husband had sold Farewell Lake Lodge to Frost and Spencer at a $270,000 discount and they considered that amount part of their daughter's inheritance. Frost also testified; she described financial benefits Spencer received from Footloose Alaska, such as money for repairs to his planes, and claimed to have invested her Permanent Fund Dividends into Footloose Alaska. She also talked about Spencer's decreasing involvement in the business. Her direct examination ended, though she stated that "we have more witnesses" and "there's so much I haven't been able to say," because her attorney decided to reserve the remaining ten minutes the court allotted to make a closing statement.

Frost's attorney argued in closing that the parties' behavior—in particular, Spencer's benefiting financially from owning Footloose Alaska despite having ceased to contribute labor and Frost's continuing to work tirelessly to host weddings at the lodge—indicated that their arrangement was for Frost to work toward full ownership of Raven Glacier Lodge. Spencer's attorney spoke in closing about the values of the partnership property, arguing that certain personalty did not belong to the partnership, and about which party should retain possession of each item on his list.

**3.** Frost's brief also noted that "[t]his is a partnership dissolution" and "[t]he parties never cohabited and any romantic entanglements ended long ago," but Frost did not object to Spencer's assertion that the brief accepted the application of domestic relations law. Frost's attorney stated

in closing argument that "[i]t appears that we are arguing that this is a domestic partnership" and referred by name to *Tolan v. Kimball*, 33 P.3d 1152 (Alaska 2001), a case describing the legal rule to apply to divide the property of separating unmarried cohabitants.

On June 9, 2006, the superior court informed the parties that it would be reversible error to apply the law of domestic partnership to the case. The court noted it was "undisputed these two parties did not live together." The superior court stated that "the presumption under Alaska law is that assets acquired during a co-tenancy or a partnership are to be ... divided 50/50 in the absence of an indication of an agreement to the contrary." Because the court "was certainly provided with no written agreement indicating any contrary intention between the two parties" and did not hear "any testimony of either party that there was something different intended with regard to the acquisition of these assets," it decided to divide the partnership assets equally. The court believed that the parties' failure to offer evidence of "what's been contributed by each party to this partnership financially," or to present any information regarding capital accounts, reinforced its decision to divide the existing assets. The court then recited which property it believed was part of the business, stated the value of each partnership asset, and calculated that Frost was to pay Spencer $483,196 [4] as an "equalization payment" because the property of which she was to retain ownership—including the two lodges—was more valuable than what Spencer was to keep. This calculation "did not accord any reduction for the theory that ... some component of the value [of Farewell Lake Lodge] was inherited property to Ms. Frost." The court told the parties that because it was unexpectedly basing its decision on partnership law, this outcome was tentative pending any written responses to the ruling they chose to submit.

Frost filed an objection to the court's decision, contesting the court's application of law, noting factual issues about which the court had not heard sufficient evidence, and requesting a supplemental evidentiary hearing. She argued that partnership law provided for her purchase of Spencer's interest in the business at its value on the date of dissolution and that the court had not determined that date. She further argued that the law required establishing the value of each partner's capital contributions to the business rather than dividing the partnership assets; thus, there were various relevant but undeveloped facts, including personal loans Frost and Spencer took to gather funds for the business and Frost's contribution of her inheritance in the form of a discount in the purchase price for Farewell Lake Lodge. Spencer filed a response, arguing that the court needed only to find the assets and liabilities of the partnership, which it did, and noting that "defendant had ample time pretrial and during the trial to develop her case."

On July 12, 2006, the court made its previously announced decision final. The court rejected Frost's objection because neither party had "established by a preponderance of the evidence that there is anything different than a[n] equal partnership with respect to capital accounts," and Frost had "failed to prove by a preponderance of the evidence that there was a deflation in the purchase price of the Farewell Lake Lodge." [5]

Frost moved for both reconsideration of the judgment and a new trial. The superior court denied both motions in December 2006.

Both parties appealed.

### III. STANDARD OF REVIEW

The dispositive issue in this appeal is whether the superior court erred in denying Frost's request for a supplemental evidentiary hearing. This is a question of law, which we review de novo.[6]

### IV. DISCUSSION

**The Court Abused Its Discretion in Denying a Supplemental Evidentiary Hearing.**

■ Frost primarily argues in this appeal that the court's decision to resolve this case

---

4. The court later adjusted this amount to $475,927 and added prejudgment interest in the amount of $6,992.

5. The court also rejected a motion Spencer had filed for attorney's fees under Alaska Civil Rule 82, concluding that neither party had prevailed.

6. *Godfrey v. State, Dep't of Cmty. & Econ. Dev.*, 175 P.3d 1198, 1201 (Alaska 2007) (citing *Dominish v. State, Commercial Fisheries Entry Comm'n*, 907 P.2d 487, 492 (Alaska 1995)).

based on business partnership law, despite the parties' explicit agreement and expectation that the resolution would rest on domestic relations or domestic partnership law, violated her right to due process under the Alaska Constitution.[7] She contends that the court's post-trial decision to apply a different body of substantive law than she anticipated meant that different evidence would be significant to the outcome of the case. She also argues that the superior court's refusal to extend her trial time or to grant a new trial violated due process because the strict time limits at trial, considered in light of the additional evidence made significant by the application of partnership law, prevented her from presenting relevant information to the court. Spencer responds that Frost was on notice that the court had before it the issue of what law applied. He also notes that he was subject to the same time limitations Frost faced at trial and argues that the court appropriately used its discretion in controlling the presentation of evidence.

Subsumed within Frost's due process claim is a claim that the superior court abused its discretion by applying unfair procedures. In recognition of our practice of reaching constitutional issues only when a case cannot be fairly decided on other grounds, we resolve this case on abuse of discretion rather than due process grounds.[8]

■ Basic procedural fairness requires notice and an opportunity for a hearing that is appropriate in light of the nature of the case.[9] A hearing is necessary "to give the parties an opportunity to present the quantum of evidence needed [for the court] to make an informed and principled determination." [10] Although these principles are elements of procedural due process, the nonconstitutional abuse of discretion standard also encompasses them.[11]

It is clear from the record that the parties had agreed to resolve the case under domestic relations or domestic partnership law. The superior court allowed for written responses precisely because "the parties have looked at this and applied the law of domestic cohabitants." Though the parties were permitted to and did submit written arguments before the court issued a final decision in the case, the court did not hold an additional evidentiary hearing after the court's announcement of its tentative ruling. Because basic fairness requires an opportunity to present relevant evidence, applying an unanticipated body of law could be an abuse of discretion if doing so were to make different outcome-determinative facts relevant. To assess Frost's abuse of discretion claim, then, we inquire whether the court's application of business partnership law would, if announced at the outset of the trial, have reasonably led Frost to present different evidence or to place more emphasis on some of the evidence that she did present.

The laws of domestic partnership and business partnership are distinct. We decided in

---

7. Frost also argues that it was an abuse of discretion to limit her time to testify, that it was an abuse of discretion not to grant a new trial at her request, and that some of the superior court's findings of fact were clearly erroneous. Spencer filed a cross-appeal, arguing that the court erred in refusing to declare him the prevailing party and award him attorney's fees, and that the superior court calculated prejudgment interest beginning on the incorrect date. Because our holding that a supplemental evidentiary should have been granted renders these issues moot, we do not address them.

8. *Alaska Trademark Shellfish, LLC v. State*, 91 P.3d 953, 957 n. 12 (Alaska 2004) ("We have often recognized that appeals ordinarily should not be decided on constitutional grounds when narrower grounds are available."). *See also State, Dep't of Health & Soc. Servs. v. Valley*

*Hosp. Ass'n, Inc.*, 116 P.3d 580 (Alaska 2005) (recognizing "our practice of reaching constitutional issues only when the case cannot be fairly decided on statutory or other grounds" (citing *Kenai Peninsula Fisherman's Coop. Ass'n, Inc. v. State*, 628 P.2d 897, 908 (Alaska 1981))).

9. *See, e.g., Price v. Eastham*, 75 P.3d 1051, 1056 (Alaska 2003).

10. *Id.* at 1056 (quoting *Walker v. Walker*, 960 P.2d 620, 622 (Alaska 1998)) (alteration in *Walker*).

11. Not every abuse of discretion is a due process violation. Having found that there was an abuse of discretion we do not reach the question of whether the underlying conduct also constituted a due process violation.

*Tolan v. Kimball*[12] that when a court oversees the separation of a nonmarried couple, "to the extent it is ascertainable, intent of the parties should control the distribution of property accumulated during the course of cohabitation."[13] In *Tolan,* we held that it was not error for the superior court to determine that a former couple jointly owned the home they had shared, even though only one name was on the title, because both individuals had contributed to the down payment for and subsequent mortgage payments on the house, as well as to its physical upkeep.[14] The evidence presented at trial in the suit between Frost and Spencer regarding the purchase and use of the real property and planes suggests that the parties anticipated the court would apply analogous logic here.[15]

Different rules govern winding up the affairs of a business partnership. In Frost and Spencer's case, the superior court apparently applied the now-repealed version of the Alaska Uniform Partnership Act[16] (AUPA) and neither party has argued to this court that failing to apply the current version was error. To be consistent with the proceedings below and because the changes in the code do not impact the result here,[17] we too rely on the former statutory text.

We note, however, that the superior court should use the current AUPA upon issuing a new ruling as required by this opinion.[18] Winding up a partnership involves liquidating assets to repay the partnership's debts and then distributing remaining funds, if any, to the dissociating partners according to the capital contributions and share of profits or losses. Alaska Statute 32.05.330 described this process:

> When dissolution is caused in any way, except in contravention of the partnership agreement, each partner, as against the copartners and all persons claiming through them in respect of their interest in the partnership, unless otherwise agreed, may have the partnership property applied to discharge its liabilities, and the surplus applied to pay in cash the net amount owing to the respective partners.[19]

The AUPA further commanded that liabilities were to be discharged in the following order: "(A) those owing to creditors other than partners; (B) those owing to partners other than for capital and profits; (C) those owing to partners in respect of capital; (D) those owing to partners in respect of prof-

---

**12.** 33 P.3d 1152 (Alaska 2001).

**13.** *Id.* at 1155 (citing *Wood v. Collins,* 812 P.2d 951, 956 (Alaska 1991)).

**14.** *Id.* at 1154–56.

**15.** *Cf. Bishop v. Clark,* 54 P.3d 804, 811 (Alaska 2002) ("In determining the intent of cohabiting parties, courts consider, among other factors, whether the parties have (1) made joint financial arrangements such as joint savings or checking accounts, or jointly titled property; (2) filed joint tax returns; (3) held themselves out as husband and wife; (4) contributed to the payment of household expenses; (5) contributed to the improvement and maintenance of the disputed property; and (6) participated in a joint business venture. Whether they have raised children together or incurred joint debts is also important." (footnotes omitted) ).

**16.** Former AS 32.05.010 *et seq.* (repealed 2000).

**17.** In particular, AS 32.06.807, "[s]ettlement of accounts and contributions among partners," and AS 32.06.401, "[p]artner's rights and duties," include no substantive changes to part-

nership law that would alter the outcome as it is explained below.

**18.** The repealed version of the AUPA was replaced by AS 32.06.201 *et seq.,* which "appl[ies] to all partnerships and limited liability partnerships" as of January 1, 2004. Ch. 115, § 10, SLA 2000. Because this suit began in 2005, it is clear that the current AUPA applies here.

**19.** Former AS 32.05.330(a). The remainder of that statute controlled wrongful dissolution, *see* former AS 32.05.330(b), but neither party has claimed that the other breached their partnership agreement. Another provision of the AUPA provided more detail regarding the allocation of funds to partners:

> [S]ubject to any agreement between [partners], . . . (1) each partner shall be repaid the partner's contributions, whether by way of capital or advances to the partnership property, and shares equally in the profits and surplus remaining after all liabilities, including those to partners, are satisfied; and, except as provided in AS 32.05.100(b), shall contribute towards the losses, whether of capital or otherwise, sustained by the partnership according to the partner's share in the profits.

its." [20]

These statements of law indicate that a court must find different facts to manage the termination of a partnership than it would to oversee the conclusion of a domestic relationship. In particular, in a business partnership dissolution the amount of each partner's capital contribution is critical because proceeds from the dissolution are applied to the return of capital on a dollar-for-dollar basis before profits may be distributed.[21] Further, non-cash contributions of personal services may qualify as capital contributions.[22] By contrast, the precise amounts paid by each partner in a domestic partnership may be of little relevance.[23] Loans made by a partner to a business partnership are likewise recovered on a dollar-for-dollar basis before profits are distributed and payments to a partner must be credited against distributions.[24] Again, in the dissolution of a domestic partnership loans and payments may have little importance. In addition, if there are profits to distribute in a business partnership dissolution, the distribution of them must be according to the parties' agreement as to how profits should be shared.[25] Thus, evidence as to the parties' agreement for sharing profits is critical in a business partnership dissolution. But when the entity being dissolved is a domestic partnership the court and the parties generally do not focus on profits or what the parties said as to how they would be shared. Finally, personal non-business items are seldom considered business partnership property, whereas they readily may be considered part of a domestic partnership.

Frost claims that if she had been given notice that this case would be tried as a business partnership dissolution, and if she had been given sufficient time, she would have presented evidence bearing on the parties' capital contributions, advances, how profits were to be distributed, and the non-

business partnership nature of some of the property that the court took into account. She states:

Had Ms. Frost been given proper notice of the legal standards that the trial court was going to apply to her case, however, she would have been able to put on evidence of:

- The specific nature of the original partnership agreement with Spencer;
- How the partnership agreement was fundamentally amended when Ms. Frost's wedding business began at Raven Glacier Lodge;
- Ms. Frost's capital contributions in the form of foregoing her inheritance and in the form of monies generated by her own separate business activities;
- The business purposes of various items at the Raven Glacier Lodge (*i.e.* whether they were for the purposes of the partnership business or for separate purposes);
- Advances of partnership assets made to Spencer.

In our view Frost has made a plausible showing that if she had known before the trial that the case was to be decided under business partnership law principles, her evidentiary presentation would have been different. We conclude that the court abused its discretion in refusing to grant her request for an additional evidentiary hearing following the court's announcement that the case would be decided under business partnership principles.

On remand a supplemental evidentiary hearing should be held. Both parties should be given sufficient time to present evidence relevant to a business partnership dissolution considering the size and value of the partnership and the duration of its existence.

Former AS 32.05.130.

**20.** Former AS 32.05.350(2).

**21.** *See id.*

**22.** *See Schymanski v. Conventz,* 674 P.2d 281, 284 (Alaska 1983) (personal services may be capital contributions by express or implied agreement).

**23.** *Cf. Tolan v. Kimball,* 33 P.3d 1152, 1152–54 (Alaska 2001) (discussing approximate amounts of unmarried cohabitants' financial contributions to their home but never calculating totals or ordering those funds be repaid).

**24.** *See* former AS 32.05.350(2).

**25.** *See* former AS 32.05.130(1).

## V. CONCLUSION

Because Frost's request for an additional evidentiary hearing should have been granted, we VACATE the superior court's judgment, including its findings of fact, and REMAND for further evidentiary proceedings.

MATTHEWS, Justice, with whom FABE, Chief Justice, joins, concurring.

EASTAUGH, Justice, concurring.

MATTHEWS, Justice, with whom FABE, Chief Justice, joins, concurring.

I agree with today's per curiam opinion. But I would hold that due process—in addition to the abuse of discretion standard—required a supplemental evidentiary hearing. I doubt that the principle that constitutional grounds should not be reached when a case may be decided on non-constitutional grounds should apply to this or other cases where the constitutional grounds supply the standard on which the non-constitutional grounds are based. Taken to extremes, application of the principle would mean that there would never be constitutionally based rulings where it could be said that the questioned conduct also amounted to a non-constitutional error subsumed in the constitutional standard.

EASTAUGH, Justice, concurring.

For all the reasons the per curiam opinion ably discusses, I agree that a remand is necessary and that we do not need to reach Frost's due process arguments.

But I write separately because in my view it was an abuse of discretion not to grant Frost's Alaska Civil Rule 59(a) motion for a new trial. There may not seem to be much difference between a remand for a new trial and a remand for a further evidentiary hearing. Either way, as the court's opinion recognizes, the parties must have an adequate opportunity to offer evidence relevant to the legal principles that control the dispute. Perhaps it is only a matter of degree, but remanding for a new trial, rather than for an additional evidentiary hearing, helps emphasize that much of the evidence offered at the first trial may be irrelevant at the second,

and that the parties will need to start over in marshaling and presenting the evidence relevant to the business partnership law applicable to their lawsuit. Remanding for "an additional hearing" might be taken as a suggestion that a supplemental hearing will do. In light of the rigorous time limits imposed on the parties at the first trial, an evidentiary hearing that merely supplements the evidence offered at the first trial may not give the parties enough time to try their case adequately. I therefore prefer to resolve the appeal in terms of the denial of Frost's motion for a new trial or a partial new trial.