WINFREE, Justice,
with whom STOWERS, Justice, joins, dissenting in part.
I. OVERVIEW
Today the court implicitly decides a longstanding dispute between the State of Alaska, Department of Natural Resources, and the companies controlling North Slope oil production and distribution through their related companies' Trans-Alaska Pipeline System (TAPS) and oil tankers. This dispute is: Why has North Slope oil production and TAPS input declined so that TAPS has excess capacity? Is it because the oil companies are warehousing proven reserves for their own internal business reasons, notwithstanding that the reserves are technically and economically available for production,[1] or is it because external factors limit current production of proven reserves? The dispute arose in a matter before this court in 2012, when we considered certain superior court rulings in a legal battle over development of Point Thomson oil and gas reserves, but that battle was settled.[2]
The dispute again arises, this time indirectly from a legal battle over the 2006 TAPS property tax valuation and the concept of depreciation for obsolescence, a battle in which the Department of Revenue, and not the Department of Natural Resources, is a participant. In the superior court proceedings, the parties contested whether there should be a depreciation deduction for functional obsolescence due to TAPS's excess capacity-a functional obsolescence deduction *497 is appropriate when an asset has become less useful due to its flawed or outdated physical characteristies. The superior court rejected depreciation for functional obsolescence. However, after trial and without any prior notice to the parties, the superior court determined that TAPS's excess capacity warranted an economic obsolescence deduction-an economic obsolescence deduction is appropriate when an asset has become less useful due to external causal factors affecting the entire business.[3] But at no point during the underlying litigation, either before the State Assessment Review Board (SARB) or the superior court, did anyone argue for an economic obsolescence deduction based on excess capacity or present evidence demonstrating external causes of production decline and ensuing throughput decline.[4]
By affirming the superior court's determination that an economic obsolescence deduction is warranted for the 2006 TAPS valuation, the court necessarily holds that TAPS's throughput decline is caused by external factors outside the oil companies' control. That issue was not litigated in the superior court, neither the superior court nor the court today explains exactly what factors external to the oil companies are causing TAPS's throughput decline, and the determination likely will have an impact far beyond TAPS's 2006 property tax valuation. I would vacate the superior court's determination that an economic obsolescence deduction is warranted for the 2006 tax year and remand for further trial proceedings on the question; I therefore dissent on this aspect of the court's decision.
*498 II. DISCUSSION
A. A Separate Functional Obsolescence Deduction Was Correctly Rejected By The Superior Court.
The superior court found that a separate functional obsolescence depreciation deduction [5] is improper because the Owners have obligations to maintain TAPS's physical capacity at 1.1 million barrels per day. This capacity requirement makes a functional obsolescence deduction inappropriate because TAPS's excess capacity provides value by meeting minimum capacity requirements; TAPS's best and most cost-effective design would have to incorporate this required capacity-it therefore is not physically flawed or outdated. I agree with the court that this aspect of the superior court's decision is correct.[6]
B. A Separate Economic Obsolescence Deduction May Be Appropriate But Was Not Adequately Litigated In The Superior Court.
1. Depreciation for economic obsolescence relies on a different threshold determination than for functional obsolescence.
Because depreciation for functional obsolescence was correctly rejected, a separate obsolescence depreciation deduction could be warranted only under an economic obsolescence theory, Economic obsolescence is "the loss in value or usefulness of a property caused by factors external to the asset," including increased costs, reduced demand, increased competition, regulation, or similar factors.[7] "[EJeonomic obsolescence is usually a function of outside influences that affect an entire business...." [8] Therefore, a separate economic obsolescence deduction for TAPS would be appropriate only if loss in value were caused by external factors beyond the control of the integrated enterprise of which TAPS is a part.
It is here that the court's analysis falters-the court, like the superior court, relies on the declining oil supply to TAPS as an external factor supporting a depreciation deduction for economic obsolescence. But the court is affirming the superior court's determination that to properly value TAPS, it must be considered as an integrated part of the entire production-transportation business.[9] In short, the Owners' integrated enterprise controls TAPS's supply-therefore declining supply warrants an economic obsolescence depreciation deduction only if it is caused by factors external to the Owners' integrated enterprise. The court, like the superior court, identifies no relevant external factors causing declining oil supply to TAPS.
If low throughput is the result of factors external to the integrated enterprise, then it may be appropriate to apply an economic obsolescence deduction. But if low throughput is the result of factors within the integrated enterprise's control-for example, if affiliated production companies failed to utilize productive fields or delivered less oil to TAPS for the integrated enterprise's internal purposes-then an economic obsolescence deduction may be inappropriate or at least limited. As alluded to earlier, in State, Department of Natural Resources v. Exxzon- *499 Mobil Corp. the Department of Natural Resources argued that oil companies, in derogation of lease obligations, were deliberately stalling production of the Point Thomson oil and gas reserves to advance their own internal interests.[10] More recently, Alaskans have been inundated with political commentary regarding a referendum to overturn the legislature's latest restructwring of Alaska's oil-tax framework,[11] including spirited debate whether oil production has been limited by excessive taxation or oil compamies have delayed production to leverage legislative action lowering oil taxes.
Let me be clear: I raise these issues simply to make my point about the necessary threshold determination for an economic obsolescence deduction. I have no view on the actual cause of TAPS's low throughput and would look to the development of a full evi-dentiary record, rather than public commentary or the State's briefing in the Point Thomson matter, as the factual basis for a reasoned decision. And I also note that delaying oil production to serve the integrated enterprise's internal business purposes would not necessarily be an inappropriate business decision; but such a decision might be incompatible with a depreciation deduction for economic obsolescence due to TAPS's declining throughput.
This threshold issue is unique to economic obsolescence and highlights the important distinction between economic and functional obsolescence, which the court clearly misunderstands. Even if both forms of obsolescence might be used to calculate a loss in TAPS's value due to excess capacity, they focus on different reasons for the excess capacity and therefore require different threshold determinations.[12] The court is incorrect in stating, contrary to indisputable appraisal theory,[13] that "whether the superi- or court's deduction was labeled as functional or economic obsolescence is of no consequence." [14] Because the Owners did not argue for low-throughput economic obsoles-cenee, the threshold issue-whether factors external to the integrated enterprise caused the low throughput and resulting excess capacity-was not litigated at trial.
2. -As a matter of procedural fairness, the parties should be allowed to litigate whether a separate economic obsolescence deduction is appropriate.
The North Slope Borough and the Fairbanks North Star Borough (the Boroughs) rightfully contend that the superior court erred by allowing the economic obsolescence deduction for low throughput when one argued or presented evidence ... that TAPS should be scaled as a result of a lack of supply." The court nonetheless rejects this contention, reasoning that because the claim for "a sealing deduction for excess capacity" was litigated and because the sealing caleulation is similar for both types of obsolescence, the parties adequately litigated the substance of a low-throughput based economic obsolescence deduction.[15]
Although the sealing calculation may be used to measure either functional or economic obsolescence,[16] as discussed above the two forms of obsolescence stem from different sources and litigating one did not adequately prepare the superior court to rule on the other. Although some arguments and testimony touched on the issue of oil field decline, *500 low throughput was raised only tangentially to functional obsolescence arguments.[17]
We have held that we may affirm "on any basis supported by the record, even if that basis was not considered by the court below or advanced by any party."[18] But we also have held that "[blecause basic fairness requires an opportunity to present relevant evidence, applying an unanticipated body of law could be an abuse of discretion if doing so were to make different outcome-determinative facts relevant." [19] Here the Boroughs argue that to receive a separate economic obsolescence deduction, the Owners had (but failed to meet) the burden of raising the issue and proving the cause and quantity of economic obsolescence due to low throughput.[20] The Boroughs also argue that if the Owners had advanced a claim for economic obsolescence based on low throughput, the Boroughs would have had an opportunity to present evidence and arguments rebutting it. I agree-because the threshold factor for an economic obsolescence deduction was not directly litigated, a remand on this issue is necessary as a matter of procedural fairness.
C. There May Have Been Double Counting Of Economic Obsolescence, But It Also Was Not Adequately Litigated Below.
Economic age-life is a method of measuring depreciation based on the ratio of a property's effective age to its economic life expectancy.[21] The superior court concluded that TAPS's physical life "is virtually unlimited if properly maintained," but TAPS's proven economic life will not extend past 2047 when decreased production due to declining reserves will make TAPS no longer technically and economically viable.
The superior court recognized that economic age-life calculations measure all forms of depreciation, including functional and economic obsolescence,[22] and determined that SARB's and the Department of Revenue's characterizations of economic age-life depreciation as capturing only physical depreciation was improper. But the superior court then categorized its own economic age-life analysis as measuring only physical depreciation and made its separate deduction for economic obsolescence due to declining throughput. Assuming that the superior court's application of a separate economic obsolescence deduction was correct, it may have double counted economic depreciation.
The court, citing State Assessor Randall Hoffbeck's testimony and The Appraisal of Real Estate, concludes that the superior court did not double count economic obsolescence because "while economic age-life captures more than just physical depreciation" the court is allowed to take a second look at other types of obsolescence.[23] The court acknowledges that "the superior court took into account projections for declining throughput in determining economic life" but states that "the economic age-ife calculation did not take into account the fact that the design capacity of the pipeline ... is considerably greater than necessary to handle projected throughput." [24]
*501 This is an incorrect analysis. The Appraisal of Real Estate provides for additional economic obsolescence depreciation only when it is not included in the economic age-life calculation.[25] But no witness, including Hoffbeck, testified that the superior court's age-life calculation excluded economic obsolescence. In fact, economic obsolescence was not excluded in the superior court's age-life calculation-because the superior court's economic age-life calculation was based entirely on declining throughput due to dwindling reserves, it already took economic obsolescence into account. And, as discussed above, TAPS's excess capacity itself does not cause a loss in value-any economic obsolescence must be due to external factors causing low throughput. Therefore the separate economic obsolescence deduction due to declining production, over and above the economic age-life depreciation deduction, may have been an erroneous double counting.
This issue was not fully presented or argued because the superior court applied its separate economic obsolescence deduction sua sponte after trial and without notice to the parties. This issue should be remanded to the superior court for further trial proceedings to determine the appropriateness of deducting for economic obsolescence based on decreased throughput after already accounting for decreased throughput when determining TAPS's economic life.
IH. CONCLUSION
In affirming the superior court's determination that the Owners are entitled to a depreciation deduction for economic obsolescence due to TAPS's low throughput, the court leaves two critical questions unanswered. If the Owners are legally and contractually required to maintain the current capacity, how can there be any form of obsolescence depreciation? And if there could be economic obsolescence based on TAPS's low throughput, what factors external to the integrated enterprise are causing the declining production and delivery to the pipeline?
I would vacate the superior court's determination that the Owners are entitled to an economic obsolescence deduction based on TAPS's excess capacity and remand for a new trial on that issue. Therefore, I respectfully dissent.

 . The superior court found that there are adequate proven reserves to allow TAPS to operate at least until 2047 and that North Slope reserves contain billions of barrels of "technically and economically recoverable oil." We affirm this finding, Op. at 489-91, noting that the superior court estimated the reserves to be worth $350 billion, Op. at 485.

. State, Dep't of Natural Res. v. ExxonMobil Corp., No. S-13730 (Alaska, filed May 10, 2011).

. The superior court stated that "the fact that external economic factors, and specifically the decreased availability of North Slope oil, may preclude the full use of TAPS' capacity, does form a basis for a scaling adjustment based on economic obsolescence."

. The court incorrectly states that the Owners urged the superior court to find that TAPS's excess capacity warranted a deduction for "economic or functional obsolescence." Op. at 491. The Owners argued to the superior court that excess capacity warranted a deduction for functional obsolescence, not economic obsolescence. The Owners' argument for an economic obsolescence deduction was limited to the assertion that tariff regulations were a form of economic obsolescence, which both the superior court and this court correctly rejected. Op. at 487-90.
The Owners do not even contend on appeal that they argued in the superior court for an economic obsolescence deduction for low throughput-in their brief to us they describe the Department of Revenue's original characterization of the obsolescence factor as functional, and then simply state that the superior court addressed the obsolescence factor "from a different perspective." At oral argument before us the Owners' attorney expressly described what happened as follows:
Everybody analyzed it in the past as functional, the State, the SARB, taxpayer, were treating it as functional. But it was the same facts, it was the same condition of excess capacity, that was being addressed. And so all Judge Gleason did was change the way she named the adjustment she made for excess capacity of TAPS. Instead of calling it functional, she called it external. But she was analyzing those same facts and just calling it another name.
The Department of Revenue is even more direct in a heading in its brief: "The superior court properly determined that lower available throughput in TAPS is a basis for economic obsolescence despite that point not being specifically advocated at trial."
In response to my dissent the court asserts that because the Owners (1) stated in their notice of appeal to the superior court that SARB failed to apply all forms of depreciation, and (2) argued economic obsolescence to the superior court, the issue was squarely before the superior court. Op. at 491 n. 52. The broad sweep of the notice of appeal is irrelevant-what is relevant is the precise nature of the economic obsolescence argument the Owners actually presented to the superior court. The economic obsolescence argument presented to the superior court was based on tariff regulations, not low throughput. If the Owners presented evidence to support a claim of economic obsolescence based on low throughput, then the court should be able to identify and quote at least one trial expert witness who testified that low throughput should result in a depreciation deduction for economic obsolescence. The court did not, because it cannot. If the Owners presented and proved their entitlement to an economic obsolescence depreciation deduction based on low throughput, the court should be able to identify and quote from at least one trial expert witness who testified about factors external to the integrated enterprise that have caused the declining production and delivery of oil to TAPS. The court did not, because it cannot. Both the Department of Revenue and the Owners conceded that the question of an economic obsolescence depreciation deduc *498 tion for low throughput was not specifically raised at trial-the court is in error on this point.

. Functional obsolescence is defined as "a flaw in the structure, materials, or design that diminishes the function, utility, and value of the improvement." Arpraisat Inst, THE Appraisar or Rear Estate 331 (13th ed.2008).

. In my view this same reasoning should preclude a depreciation deduction for economic obsolescence, as well. The court concedes that there is "a certain degree of internal inconsistency" in the superior court's ruling, but brushes it aside without any explanation. Op. 31. As part of the remand I would order for further trial proceedings, the superior court would be directed to explain this inconsistency.

. Am. Soc'y or Arpraisers, Varuing MacHinEry anp Equipment 96-97 (2d ed.2005); see also Horan v. Kenai Peninsula Borough Bd. of Equalization, 247 P.3d 990, 996 n. 39 (Alaska 2011) (quoting Buack's Law Dictionary 1107 (8th ed.2004)).

. Am. Soc'y or Appraisers, supra note 7, at 97.

. The superior court found that TAPS is part of an integrated economic enterprise in which the TAPS owners are closely affiliated with companies producing Alaska North Slope oil, and that "TAPS was built ... because of the overwhelming economic value arising from its highly integrated use for transporting [Alaska North Slope] production from affiliated producers." As the court notes, these findings are unchallenged.

. Brief for Appellant at 2-3, State, Dep't of Natural Res. v. ExxonMobil Corp., No. S-13730 (Alaska, filed May 10, 2011).

. See Ch. 10, § 13, SLA 2013; Veto Referendum for Senate Bill (S.B.) 21 (2014).

. See Am. Soc'y or Appraisers, supra note 7, at 98 ("If the plant is not operating at capacity for economic reasons, the inutility is caused by economic obsolescence. If there is an imbalance in the productive capacity (e.g., a production bottleneck), the inutility is caused by functional obsolescence.").

. See supra notes 5, 7, 8, 12, and accompanying text.

. Op. at 493. This statement also is inconsistent with our affirmance of the superior court's determination that a functional obsolescence deduction was not warranted.

. Op. at 494.

. See Am. Soc'y or Appraisers, supra note 7, at 98 (explaining that cost-to-capacity calculation may be used to calculate impact of inutility from either functional or economic obsolescence sources).

. For example, the Owners argued for an unde-rutilization deduction due to declining oil fields but characterized this as functional obsolescence and focused on resulting increased operating costs. This begged the question of the low throughput's cause.

. Powercorp Alaska, LLC v. Alaska Energy Auth., 290 P.3d 1173, 1183 n. 25 (Alaska 2012) (quoting Smith v. Stafford, 189 P.3d 1065, 1070 (Alaska 2008)).

. Frost v. Spencer, 218 P.3d 678, 682 (Alaska 2009); see also Powercorp, 290 P.3d. at 1193 (Winfree, J., dissenting) (disagreeing with ruling on issue not litigated before the superior court because parties had not submitted evidence on issue); Crowley v. State, Dep't of Health & Soc. Servs., 253 P.3d 1226, 1232 n. 31 (Alaska 2011) (declining to consider arguments not raised before trial court if issue is dependent on new or controverted facts).

. See AS N. Star Alaska Hous. Corp. v. Fairbanks N. Star Borough Bd. of Equalization, 844 P.2d 1109, 1110-12 (Alaska 1993).

. Appraisac Inst., supra note 5, at 420-22.

. See id. at 420 (describing the economic age-life method as measuring "total depreciation"); see also Am. Soc'y or Arpraisers, supra note 7, at 39-40 (recognizing age-to-life ratios may be used to estimate total depreciation).

. Op. at 494.

. Op. at 494-95.

. Aprraisat Inst. supra note 5, at 423 ("[If external obsolescence is affecting the subject property and there are no sales in the subject market similarly affected, the appraiser can estimate total depreciation and economic life without the external obsolescence using the ... economic age-life method and then estimate external obsolescence using techniques from the breakdown method.").